# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LINDA ELLIOT :
:
VS. : C.A. NO. 05-479-ML
:
RARE HOSPITALITY, INC. d/b/a :
THE CAPITAL GRILLE :

DEPOSITION OF LINDA ELLIOT, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant, before Carole J. Ogden, Registered Professional Reporter, a Notary Public in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on September 14, 2006 at 10:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF.... SAMMARTINO & BERG, LLP
128 DORRANCE STREET, SUITE 400
PROVIDENCE, RHODE ISLAND 02903
BY: CATHERINE SAMMARTINO, ESQUIRE

FOR THE DEFENDANT.... EDWARDS ANGELL PALMER & DODGE, LLP
2800 FINANCIAL PLAZA
PROVIDENCE, RHODE ISLAND 02903
BY: SHERYL D. HANLEY, ESQUIRE
RAYMOND M. RIPPLE, ESQUIRE

RARE HOSPITALITY, LITIGATION COUNSEL
BY: KRISTEN HATHCOAT, ESQUIRE

ALSO PRESENT......... KENNETH OSGOOD

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

A. Uh-huh. Best that I can remember.
Q. And tell me about your duties as a server at the Grille.
A. I waited tables, and my responsibilities also included handling cash for cashout.
Q. Was that a typical server responsibility?
A. No.
Q. Why did you have that responsibility?
A. I was given it. I was awarded it actually.
Q. When were you awarded that?
A. I believe it was approximately one year after I had started working there.
Q. Do you know why you were awarded that?
A. There was a position available for head server.
Q. Okay. And who awarded you that position?
A. John Jesser.
Q. Do you know how to spell his last name?
A. J-e-s-s-e-r.
Q. And a position was available. Was it advertised?
A. No.
Q. How did you learn it was available?
A. The former head server had left.
Q. Were you aware that the position was available because of that departure?
A. Yes.

Q. Okay. Did you ask about the position?
A. No.
Q. Okay. How did you learn that it would be available or how did it come to your attention that you would be considered for it?
A. I was approached by the management.
Q. Who in management approached you?
A. John Jesser.
Q. Did anyone else approach you about it?
A. No.
Q. What was said?
A. He asked me if I was interested in it.
Q. And you responded that you were interested?
A. Yes.
Q. Okay. And were there additional duties that were required as head server?
A. Yes.
Q. What were those?
A. Cashing out other servers. Helping the manager settle up the business at the end of the night. Training other servers.
Q. You would train the new servers who began?
A. Yes.
Q. Did you have any supervisory responsibility for servers?

MS. SAMMARTINO: Objection. You can answer.
Q. You can answer.
A. I don't understand the question.
Q. Did you have any supervisory responsibility for any of the servers who were there as far as imposing any discipline, communicating with management regarding issues that might arise with staff?
A. Yes.
Q. What type of responsibilities?
A. I reported -- I was the liaison between the servers and the management regarding any concerns that the servers had or any problems that occurred.
Q. What type of concerns or problems would you report?
A. If an employee had a problem, if they were upset about anything regarding the company, things like that.
Q. So did you become familiar with management policies during that time?
A. Yes.
Q. Did you become familiar with the management staff?
A. Yes.
Q. Who were the managers during the time you were head server?
A. I'd say there was John Jesser, there was Bill --

gosh. I can't remember his name.
MR. OSGOOD: Leonardo.
A. Leonardo, Ken Cusson, and Ken Osgood.
Q. The one before Ken Osgood was Ken?
A. Cusson.
Q. Do you know how to spell that?
A. C-u-s-s-o-n.
Q. And did the four individuals you named have overlapping managerial responsibilities or were they successive?
A. Successive, I guess.
Q. Did you work with each of those four individuals as a head server?
A. Yes.
Q. Were there other head servers during that time?
A. Yes.
Q. How many?
A. I can't remember. I guess -- my guess is probably about five.
Q. Do you recall who any of them were?
A. Yes.
Q. And could you tell me their names?
A. There was Anthony Santori, Ron Corbett, Anthony DiChiaro, Theresa Franco, Tim Corcoran, Michael Matusiek. There might have been others. I just can't

remember.
Q. Was there generally one head server per shift or was there more than one per shift?
A. One.
Q. Of the individuals that you named, do you know how old Anthony Santori is?
A. I don't.
Q. How about Ron Corbett approximately?
A. I'd just be guessing. 50s.
Q. He's over 40?
A. I would guess.
Q. How about Anthony DiChiaro?
A. I have no idea.
Q. Okay. Theresa Franco?
A. I have no idea.
Q. Tim Corcoran? And Michael Matusiek, do you have any idea?
A. I don't.
Q. For Tim Corcoran you had no idea?
A. No.
Q. Just important when I'm asking questions we give audible answers.
A. Uh-huh.
Q. Because the Court Reporter won't be able to see you shaking your head. And what are the skills that are

Q. Could you tell me about those.
A. Well, I was rewarded by the company for good service, letters that, you know, that would be sent in from guests, things like that. I'm sorry. Could you just repeat that question for me?
Q. Just asked if you won any awards in connection with your employment at the Capital Grille.
A. I was rewarded for my sales ability in selling different whatever -- whatever the managers decided, you know, that was important for that night. Like say, wines for whatever.
Q. Okay.
A. Things like that.
Q. Did you consider yourself a successful server?
A. Very much so.
Q. Were you one of the top servers in Providence?
A. Yes.
Q. And did you enjoy a good relationship with the managers?
A. Yes.
Q. Okay. Were they accessible for you to talk to?
A. Yes.
Q. Were they accessible for all employees?
A. Yes.
Q. Okay. During the time that you served as a management

liaison, you said you became familiar with the company's policies, correct?

A. Yes.

Q. And they have a company handbook, correct?

A. Yes.

Q. And are you familiar with that?

A. Yes.

MS. HANLEY: Okay. If I could have that marked as an exhibit, please.

(DEFENDANT'S EXHIBIT B MARKED FOR IDENTIFICATION)

Q. I'm showing you what's been marked as Exhibit B. Could you identify what that is?

A. This is the team member handbook.

Q. Okay.

A. And dated February 1998.

Q. Okay.

(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)

Q. I'm going to show you what's been marked as Exhibit C. Could you identify that document?

A. It's a team member acknowledgment regarding the team member handbook dated January 15, 2000, the drugfree workplace policy dated 2000, and tip pooling policy dated January 15.

Q. Is that your signature on each of those signature lines?

A. Yes, it is.
Q. Could you tell me about the training you participated in at the Capital Grille? Did you receive any training on issues? For example, did they have right to know hazardous substance training?
A. Yes.
Q. Did you participate in -- did they have other trainings of that type?
A. I don't understand your question.
Q. Did you attend any training sessions while you were employed at the Capital Grille?
A. Yes.
Q. What types of training sessions did you attend?
A. Bar code for liquor training. That's about all I can remember.
Q. And the right to know substance training you attended as well?
A. Yes.
Q. Did you have any training on the sexual harassment policy that you recall?
A. No.
Q. Do you recall receiving a copy of the sexual harassment policy?
A. No, I don't.
Q. Okay.

(DEFENDANT'S EXHIBIT D MARKED FOR IDENTIFICATION)

Q. I'm showing you what's been marked as Exhibit D. Can you identify that for the record?

A. This is the sexual harassment policy statement.

Q. Okay. And does your signature appear on that?

A. Yes, it is.

Q. What's the date on it?

A. January 20, 2001.

Q. Okay. If I could turn your attention to Exhibit B for a moment to Page 22. At the bottom of Page 22 -- are you on that page, Ms. Elliot?

A. Uh-huh.

Q. Is the sexual harassment policy also contained on Page 22 and 23 of the team member handbook?

A. Yes. It's different. I'm sorry. What was your question?

Q. Is the sexual harassment policy contained on Page 22 and 23 of the team member handbook?

MS. SAMMARTINO: Objection.

MS. HANLEY: What's the basis? The question isn't are they identical. The question is is there a sexual harassment policy on Pages 22 and 23 of the team member handbook.

A. Yes.

Q. Okay. Did you also receive a standalone sexual

receive any increase in pay for being head server?
A. In the beginning.
Q. What was that?
A. I can't remember.
Q. Was it a monetary amount in addition to the $2.89 an hour?
A. My best recollection it was I believe $5 an hour.
Q. An additional $5 an hour or a total of $5 an hour?
A. My best recollection is that it was $5 an hour for the shift.
Q. A head server would earn $5 per hour per shift versus $2.89 per hour per shift?
A. That's correct.
Q. How long did that continue if you recall?
A. My best recollection is I would say it was for maybe three to four years.
Q. Was it in place when you began as head server?
A. Yes.
Q. That was approximately 1992?
A. Yes.
Q. So by 1996 that had ceased; is that correct?
A. I'm guessing, but I believe it was '97. It's when the original owner had sold the company. I'm guessing that it was '97.
Q. Who was the original owner?

A. That would be Ned Grace.
Q. Do you recall when the company was sold?
A. My guess is -- I'm guessing '97.
Q. Okay. Do you recall who bought the company?
A. Longhorn Steakhouses.
Q. It was the same company who owned Longhorn Steakhouse?
A. Yes.
Q. Have there been other owners since that time that you're aware of?
A. I can't remember if it went to Longhorn or if there was anybody in between there.
Q. Was Longhorn the owners when you ended your employment?
A. Yes.
Q. And when the new owners came in in 1997, approximately what was the compensation for head server?
A. $2.89.
Q. And that's plus tips?
A. Yes.
Q. Were there any other benefits to being a head server?
A. Yes.
Q. What were those?
A. Preferred shifts.
Q. How were shifts assigned?
A. By the manager.

Q. You say that fairly confidently?
A. Yes.
Q. Why is that?
A. Well, because I mean, there's a lot of factors involved. There's some people that just do not tip. It's just the way in the business. There are people that go out for dinner and do not tip. Not everybody does. It's not required.
Q. Okay. But you never felt that it was a reflection on the service that you provided?
A. No. Absolutely not.
Q. So you didn't take it personally?
A. Never.
Q. Tell me about, you know, the work environment at the Grille? Was it a place that you enjoyed working?
MS. SAMMARTINO: Objection.
A. I enjoyed working at the Capital Grille except for when I was harassed and discriminated against, yes. I enjoyed working at the Capital Grille.
Q. You began working there in 1991?
A. Yes.
Q. And how long would you say you enjoyed working there in what you would consider to be a harassment-free environment?
A. I would say until 2001.

A. When help was asked they just scattered.
Q. And who -- are there any particular employees that you could identify who would not provide team service?
A. The atmosphere was -- the atmosphere was definitely there of no team service going on. A lot of the new servers, the newer team members that had joined the company. Even the older servers.
Q. Can you identify any particular servers who you felt this was necessary to draft?
MS. SAMMARTINO: Objection.
A. God. There were so many. Rob Moren was one.
Q. And what about Mr. Moren made you feel he wasn't a team player?
A. Whenever anybody called out for any help, he would never -- he wouldn't be there for them.
Q. Anyone else?
A. Tim Corcoran.
Q. What about Mr. Corcoran made you believe that he wasn't a team player?
A. When help was asked, he was never there for another server.
Q. Did these employees refuse to provide help or were they just not available to provide help?
A. I would say that they refused.
Q. They would -- would they actually say no, I won't

and I had ten dishes to carry, there would be no servers in the area.
Q. So it's not a case where someone expressly refused to help you when you asked them expressly, will you help me, is it?
A. I believe I have asked for help and been refused, yes.
Q. Do you know who refused to help you?
A. I can't remember the names right now on those occasions, but it did happen.
Q. How often did it happen?
A. Quite often. And not only to me personally. I mean, there were other servers that needed help and there was just no team service.
Q. Who else -- is that your opinion that there was no team service?
A. No. The management felt the same way as I did.
Q. Who in management felt that way?
A. Ken Osgood.
Q. And anyone else in management felt that way?
A. The other managers I believe at the time were probably Ron Mezza.
Q. Did Mr. Osgood say anything to you to lead you to that he believed there was no team service?
A. Yes.

Q. And you've alleged in Paragraph 20 that you were demoted --
A. Yes.
Q. -- from head server. When did that occur?
A. That occurred when I complained about Tom McDonald.
Q. When was that?
A. That would be in May of 2002 I believe. It was in May of 2002.
Q. And how were you notified that you were no longer a head server?
A. I met with Ken Osgood.
Q. Was anyone else present?
A. I don't recall. I think it was just the two of us.
Q. Do you recall where you met?
A. In Ken Osgood's office.
Q. And do you recall what was said?
A. I do.
Q. Could you tell me what was said?
A. Ken Osgood told me that he didn't want to hear any more complaints, that -- about pushing or shoving, and I explained to Ken Osgood that I never pushed or shoved anyone.
Q. Were you aware that there had been complaints about

you pushing and shoving?
A. Yes.
Q. And how had you been made aware of that?
A. There was a -- there was an incident with Regina, the one that I talked to you a little earlier about with the salads, and she complained that I pushed and shoved her also, which was untrue.
Q. And what did happen?
A. It was a false complaint. What happened was Brian Foye came down and --
Q. What happened with Regina? Why don't we -- you said that you did not push and shove her. What did happen in the incident with Regina Curran?
A. What happened was I was preparing some salads for a table, and I went to help another server, went off to help another server. When I returned to pick up my salads to serve to my table, they were gone. So I asked whoever was in the service area there, you know, did they -- did anyone take my salads or you know, where were they? And evidently it was Regina who had taken the salads.
Q. How did you learn that?
A. I believe it was another server that said that, told me that.
Q. Do you recall who?

A. No, I don't. It wasn't a big thing. I just continued on and made my own salads.

Q. Did you ever discuss it with Regina?

A. No. I just proceeded to -- proceeded to open the refrigerator and make my salads and didn't think anything of it, and as I was making my salads, Regina was behind me reaching in the same door that I was and grabbed the salad, and as she pulled it from the refrigerator she hit the side of my head with it, and again, I didn't make anything of it. I just continued on to make my salads. I went off into the dining room, and she was just upset that someone I guess had said that she took my salads.

Q. If you didn't confront her, why was she upset?

A. I guess -- I guess someone must have told her -- I mean, that the salad -- that she had taken -- that told me that she had taken the salads. It was no big deal to me.

Q. Did you discuss it with anyone else after you, you know, asked where your salads were and were told by someone that Regina Curran had taken them? Did you discuss that with anyone else?

A. No.

Q. And you say -- when you said that she hit you in the head, on the side of the head with the salad bowl, did

A. I guess it's the corporate number for -- I've never called it.
Q. Did you know it existed?
A. Yes, I did.
Q. Had you ever referred anyone to call the number?
A. No.
Q. So during the time when you were training individuals who are, you know, mentoring them, did you ever have need to reference the 800 number?
A. No. No. It wasn't -- that wasn't the quality of servers that were there at the, you know, when we hired people.
Q. Is the 800 number sometimes referred to as a hot line?
A. I guess, yes.
Q. Okay. And Regina claimed that you pushed and shoved her?
A. Yes.
Q. And do you have any knowledge as to why -- what incident she was referring to?
A. I believe it was probably the incident where she reached over me into the same cabinet that I was at and -- I mean, I was just doing what I always do. It was part of my job to make salads, to reach into the refrigerator to make salads.
Q. And when you were at the refrigerator and Regina was

mean, I couldn't see her from behind me.

Q. Uh-huh. And when in time did this happen; do you recall --

A. During service.

Q. -- what year this happened?

A. That happened in November.

Q. Is that November of 2001?

A. November 2001.

Q. And what resulted from that incident?

A. Well, Regina had made a false complaint to I guess whoever she contacted that I had pushed her, and the very next day Brian Foye came to the restaurant and called me to the office.

Q. Who was Brian Foye?

A. Brian Foye? Director of -- I don't even know his title. Director of operations probably. I don't know.

Q. Was he above Ken Osgood?

A. Yes. Regional supervisor maybe.

MS. HANLEY: Okay. If I could get this marked.

(DEFENDANT'S EXHIBIT G MARKED FOR IDENTIFICATION)

Q. I'm showing you what's been marked as Exhibit G. Do you recognize that document?

A. Yes, I do.

A. Yes.
Q. Okay. And so that accurately sets it forth in the last chance agreement, correct?
A. Yes, it does, but I was never given a chance to explain my position or what happened. I was just told to sign it or I'd be terminated, so I did sign it under duress. I did not agree with it.
Q. But do you agree that this was the policy of the Capital Grille that if someone did use physical force they were subject to termination?
A. Yes.
Q. You were not terminated, were you?
A. No. I would have been if I hadn't signed it.
Q. But you weren't terminated for that conduct?
A. No.
Q. That was --
MS. SAMMARTINO: Objection.
A. No.
Q. And how long did you continue to work there after this?
A. Let's see. If this happened in May, four months until January -- I'm sorry. Until September 26.
Q. Okay. So probably ten and a half months more, because you went through November 2001 until September 26, 2002?

be more requested by guests.
Q. Did you ever work at Sections 10, 11, and 7 after May of 2002?
A. Yes.
Q. How often did you work at those sections after May of 2002?
A. I believe I was given back my head server status. I recall it was probably two to three weeks after I had been -- after it had been taken away.
Q. So you were not a head server for a two to three-week period of time?
A. Yes.
Q. And other than that, after your first year of employment you were acting as a head server?
A. Yes.
Q. Was that still true on September 26, 2002, the day you were terminated? Were you still a head server?
A. Yes. Uh-huh.
Q. Okay. And during the two to three-week period of time that you were not acting as a head server, did your schedule change?
A. Yes.
Q. And how did it change?
A. I believe I worked -- I used to be off on Sundays. I believe I worked a Sunday or two, and the tables.

Could you repeat that again? I'm sorry. I was trying to follow you.
Q. I'm trying to -- you're saying these conversations are taking place in approximately May of 2002.
A. Uh-huh.
Q. And you haven't thus far mentioned Rob Moren as having made false statements about you. I'm trying to determine what false statements you --
A. Pushing and shoving.
Q. When --
A. Chris was well aware that Tom McDonald and also Rob Moren and Regina, who was a friend of the male servers, he had heard these three servers say that they were -- that they were out to get me, and by that I meant that they were out to get me fired through their little -- it was their group that would constantly say that I was pushing and shoving people, which was totally false.
Q. Do you have any sense of why they would say that?
A. No, I don't. It's -- because it never happened.
Q. Is there anything --
A. I believe that they -- if they thought that they could go to management and make me look bad or complain about me that they would get me fired.
Q. You'd worked with them for long time, hadn't you?

regarding Tom McDonald and Rob Moren and Regina discussing pushing and shoving.

Q. Was this based on a conversation that Chris Reynolds had with those individuals or was it based on something he had heard from others?

A. It was a conversation that he and I had. I don't know.

Q. So you don't know if he has firsthand knowledge of a conversation that they had?

A. No. Myself, I personally heard them talking about pushing and shoving also. Tom McDonald, Rob Moren, and Regina.

Q. My question is do you know if Chris Reynolds personally heard them talking about it or whether he was just generally aware, you know, that he had heard of it?

A. I would say that.

Q. So you don't know that he actually witnessed them and heard them talking?

A. No, I don't.

Q. Okay.

A. I don't.

Q. Okay. Do you have any sense of how not being head server for those two to three weeks affected your sales during that time?

A. Yes. I could tell by my paychecks, because it's recorded.
Q. You kept copies of those paychecks?
A. Oh, yes.
Q. So if I were to look at that two to three-week period, do you think it would show that there was a reduction in your pay during that time?
A. It's possible. Depending on the business, but it's possible.
Q. Is it possible that there was not a reduction during that period of time?
A. It's possible.
Q. After the demotion did your relationship with your co-workers change from your point of view?
A. It changed with certain male servers, yes.
Q. And who were those?
A. That would be Tom McDonald and Rob Moren.
Q. And how did it change?
A. The pushing and shoving became -- I became more aware of them constantly around me saying pushing and shoving, don't push me, don't shove me.
Q. Were they touching you?
A. No. They were discussing pushing and shoving between themselves.
Q. Was Regina Curran still working there at this time?

A. Well, he was preventing me from doing my job is what he was doing by extending his arm across my body, yes.

Q. In your opinion why was he doing that?

A. To prevent me from what I was doing.

Q. Why?

A. Just to harass me, as he'd been doing right along with slurs.

Q. What type of slurs?

A. Slurs by calling me bitch, by calling me queen, by calling me sexless, which was quite a routine thing whenever he was around me.

Q. You've testified that he was -- you worked probably three or four shifts per week together.

A. Yes.

Q. How frequently did he call you bitch?

A. I would say on a nightly basis.

Q. Would anyone hear that?

A. Possibly.

Q. Are you aware of anyone having heard it?

A. That particular slur, possibly yes.

Q. Do you have personal knowledge of someone having heard that, and can you identify the person for me?

A. No. I don't think I could.

Q. Do you have -- do you not recall the person or can you

speculation. It's not what she's testifying about.

A. It was one of his many --

Q. The question is, if I wrote the word queen on a piece of paper --

A. Uh-huh.

Q. -- is that a derogatory term?

A. Possibly. It could possibly be.

Q. Could it possibly not be a derogatory term?

A. Possibly.

Q. Now, you've testified and did you hear him use the phrase, the term queen on more than one occasion?

A. Yes.

Q. How many occasions?

A. I would say at least three to five.

Q. Three to five total times?

A. Within probably the last two months that I worked there about three to five.

Q. Prior to that last two months, had you heard him use that term?

A. Not that I can recall.

Q. You testified that you believed he used the term sexless?

A. Uh-huh.

Q. When do you believe he used that term?

A. I heard him say it when I would cash out with him.

Q. And in what context was that?
A. He would just say it. He would say it and walk away.
Q. So he would just be at the cash register and just say sexless?
A. That's right.
Q. Did he say anything else at that time?
A. No. He would just blurb out these horrible slurs.
Q. Was it your opinion that they were directed towards you?
MS. SAMMARTINO: Objection.
A. Yes.
Q. What made you think so?
A. When he looked directly at me.
Q. He would look at you and mumble and blurt things out?
A. That's right, yes.
Q. Did you ever hear him use these terms with other individuals?
A. No.
Q. Did you ever hear him call anyone else other than you a bitch?
A. No.
Q. Did you ever hear him call anyone else a queen?
A. No.
Q. Did you ever hear him refer to anyone else as sexless?

A. No.
Q. Was your relationship with Mr. Moren professional prior to this, you know, few-month period prior to your termination?
A. Absolutely.
Q. What happened to change it?
A. Well, it was -- I believe it was his plan with Tom McDonald and Regina Curran to have me fired from the Capital Grille.
Q. Why would you think that?
A. Why? Because Tom McDonald wanted my position. He did. It was common knowledge.
Q. How was it common knowledge?
A. Well, for instance, when he came back as server, okay, I had more than -- more cashout shifts at that time before he came there.
Q. Okay. What's a cashout shift?
A. Head server shifts. Okay. Then when Tom McDonald came they said to me, this was Jimmy Manillo who approached me and said, Tom McDonald is going to go up to Boston. We're going to give him some of your shifts, which were Station 11, which was side work captain's shift, Station 11. Okay. And they -- they took away those shifts and gave them to Tom McDonald.
Q. How many shifts were those that you were at Station

to hear any -- any complaints from me at all. At that point in time they did not want to hear any complaints at all.
Q. Did you take that to the next level and complain to someone in human resources for the company?
A. No, I didn't.
Q. And did you ever call the hot line for the company?
A. No, I didn't. I mean, in the manual it said to address the manager. This manual here that you have is dated 1998, and it says over here, I guess it was Number 26 perhaps, if I remember.
Q. It's on Page 23 I think where you're referring.
A. Uh-huh. Yes. It says, all complaints of harassment should be reported to one of your managers, which I did.
Q. Uh-huh.
A. And that was the policy of the restaurant with the management to report all complaints to the manager.
Q. Does that sentence continue, Ms. Elliot?
A. Yes, it does.
Q. What does it say?
A. It says, your regional manager or Nancy Winship in human resources.
Q. And does it give a telephone number?
A. Yes, it does.

Q. Okay. Is Nancy Winship someone that you have ever called?
A. No.
Q. Did you ever call your regional manager to discuss these concerns?
A. No. The manager of the restaurant insisted that we discuss any complaints with the management within the building only.
Q. Okay. If you keep reading in that paragraph in the bold underlined section, after the telephone number what does that next sentence say?
A. The important thing is that you talk to someone who can help.
Q. Uh-huh.
A. Uh-huh.
Q. Keep reading, please.
A. Since we cannot protect you from such behavior if we are unaware that it is occurring. The management was aware. I made the management aware repeatedly of the problems and concerns I had throughout my employment at Capital Grille.
Q. And you testified that you didn't feel satisfied with the response you received; is that correct?
A. It wasn't a matter of being satisfied.
MS. SAMMARTINO: Objection.

A. It was what I had to deal with to work there. In order to work there. That was the policy of the restaurant with the management in the Capital Grille.
Q. And does -- is that what this policy says? You agree this team handbook sets forth the policies of the Capital Grille, doesn't it?
A. Yes, it does. It says to --
Q. What does that policy say you should do if you have a complaint of harassment?
MS. SAMMARTINO: I'm going to object. It says talk to your manager or human resources. She's testified she talked to her manager repeatedly. It doesn't say, if that doesn't work go to human resources. I think we're beating a dead horse.
Q. Well, I disagree. I'm asking you, did you talk to your regional manager?
MS. SAMMARTINO: Would that be Brian Foye?
A. Brian Foye. I actually spoke to Brian Foye, yes.
Q. When did you speak Brian Foye?
A. I spoke to Brian Foye when he insisted that I sign this --
Q. After the last chance agreement, did you call Brian Foye to complain about treatment you felt you were receiving at the Capital Grille?

A. I actually wrote a memo at one point I believe to Brian Foye regarding the issue with Regina Curran, explaining to him exactly what happened, that there was no pushing and shoving.

Q. In the summer of 2002 when you claim that you were subjected to this treatment from Rob Moren, a co-worker, did you call Brian Foye or write to Brian Foye?

A. No. I reported it to my manager within the restaurant --

Q. Did you --

A. -- where I worked.

Q. Did you call Nancy Winship in human resources?

A. No, I did not. I didn't feel as though, I mean, the management insisted that we report all concerns, problems, complaints or anything directly to the manager within the restaurant. We were told to keep it in-house, not to go above.

Q. Do you have a written policy that says that?

A. No, but I have -- I spoke to Mr. Osgood about it, and he's -- we had conversations about that.

Q. Did he direct you not to go to anyone else with your concerns?

A. He directed me not to go to anyone else, yes.

Q. He said, do not go to anyone else with these concerns?

concern or problem that I had.
Q. Okay. So you're also testifying that this relationship with Rob Moren had been fine and then all of a sudden it was just deteriorated and he's all of a sudden calling you names?
A. I don't think it was ever fine. Since the day -- well, since the day he started working there.
Q. You testified it was very professional?
A. It was always professional, as it was with every server that I ever worked with and anyone that I worked with in the restaurant. That was my -- that was my level of professional.
Q. People were very professional with you?
A. Other than the ones that were harassing me, yes.
Q. Why did you think this was happening? I mean, all of a sudden in like November 2001, May 2002, you say this is going downhill. What was your belief as to why this was happening?
A. They wanted me fired.
Q. After all that time they wanted you fired?
A. Yes.
MS. SAMMARTINO: Objection.
Q. Did you think that was a new development?
A. It was a development from 2001 to 2002.
Q. Now, do you have the complaint, the exhibit that's the

complaint? All right. I see. It's Interrogatory 15. Never mind. It's the interrogatories.

MS. SAMMARTINO: I have the complaint here.

Q. I have the copy of it. Thanks. To reference Interrogatory Number 15, it's your final answer, and your final comment in that is that female servers were not promoted or hired, you know, based on their representation in the community. Can you tell me what you mean by community?

A. Well, there were very few women that actually worked at the Capital Grille, and --

Q. What community are you referencing? Are you referencing the state? The city?

A. The restaurant community.

Q. In the restaurant community. And are you referencing the same type of -- can we agree that the Capital Grille is an upscale restaurant?

A. Yes. Right.

Q. Would you characterize it as a four-star restaurant?

A. I would.

Q. Okay. And in that restaurant atmosphere, is that the community that you're referring to?

A. Yes.

Q. Are you -- were you ever involved in hiring at the

say in the last -- between 2001 and 2002.
Q. Do you know who was responsible for that? Do you have personal knowledge as to who if anyone was responsible for that?
A. Well, it had to be someone that knew my pass code.
Q. Did you give your pass code to anyone?
A. There were times when I would do training and other servers would definitely have -- anyone that has ever trained with me knew my pass code, because they would be training under my pass code. And it was common knowledge when I had that problem. I told the management that someone had my pass code, and the manager actually approached another server and asked the server directly what my pass code was, and it was Danny Pearson. Danny Pearson said it like he knew his last name.
Q. Had you trained Danny Pearson?
A. Yes. Uh-huh.
Q. And was Danny Pearson working there at this time when your checks were merged?
A. Yes, he was.
Q. Did you ever ask him if he was responsible for it?
A. Yes.
Q. And what did he say?
A. He said he'd never do something like that. We had

A. No.

Q. Why don't you think so?

A. Well, due to the fact that they had just fired Regina, I took it pretty seriously.

Q. Had you ever seen a server be fired before?

A. Yes.

Q. And had you ever seen a female server be fired before?

A. Yes.

Q. Had you ever seen a male server be fired before?

A. Yes.

Q. Is it possible he was joking when he said that?

MS. SAMMARTINO: Objection.

A. No.

Q. It's not possible?

A. No.

Q. Were there any other comments regarding your retirement? You recalled this one incident where Mr. Lydon said this. Are there any other times where you recall him making a comment regarding your retirement?

A. Yes. He -- we had a conversation during a cashout, and it went very much like this, that he said to me, haven't you had enough of this? I guess I was probably complaining to him about some incident that had happened either that night or on a different

occasion. It was a conversation that we had, and he said to me, well, haven't you had enough? Don't you just want to just retire?

Q. Did you ever talk about retirement?

A. No.

Q. Had you --

A. I loved working at the Capital Grille. I'd still be there today. I'd be there until I retired.

Q. Had you ever brought up the subject with him?

A. No.

Q. Did you ever discuss your husband's retirement with him?

A. No.

Q. Did you discuss that with anyone?

A. No.

Q. Did you ever discuss retiring in general with any of your co-workers?

A. No. I'm much too young.

Q. Did other people talk about retiring?

A. Not that I know of.

Q. So it wasn't a topic of conversation that you had?

A. No.

Q. Other than those two instances with Mr. Lydon, do you ever recall anyone else ever mentioning retirement to you?

A. I believe we were talking about how I felt I was being treated with other servers with Mr. Osgood, and again, I do recall him saying the same thing basically, you know.
Q. Do you recall did he use the word retirement or was he asking you why you were still working at the Capital Grille?
A. No. I believe retirement did come up in a conversation.
Q. Do you think he used that express word?
A. Yes.
Q. How many times do you think you had conversations with Mr. Osgood that he mentioned the word retirement in reference to you?
A. Probably a couple. One or two.
Q. Do you recall a second instance and when that would have occurred?
A. Other than a cashout, no.
Q. Do you have any --
A. That was the most opportunity that we had actually to talk was usually during cashouts while we were waiting for the other servers to finish up. That's when most of the conversations took place.
Q. You don't have a specific recollection of a time and date of a conversation you had with him regarding

retirement?
A. Other than I recall it was within the last year.
Q. Do you recall two conversations or just one?
A. I do remember one, and it was during a cashout.
Q. Did you have this conversation with anyone other than Mr. Lydon and Mr. Osgood?
A. Conversation regarding?
Q. Retirement?
A. No.
Q. Now, when you were terminated at the Grille, tell me how you were notified of your termination?
A. I was called into the office when I arrived for work. It was probably about 20 of five, 4:40.
Q. Who did you meet with?
A. I met with Ken Osgood and I believe Steve Lydon was there.
Q. Was anyone else present?
A. No.
Q. And did you take any notes during this meeting?
A. No, I did not. It was very brief.
Q. And what happened?
A. I was told that I was terminated.
Q. Who told you that?
A. Ken Osgood.
Q. What else did Ken Osgood say?

A. No.
Q. At the meeting when your employment was terminated, did anyone say anything to lead you to believe that you were being let go because of your age?
A. At the time that I left the building?
Q. At that meeting where your employment was terminated, did anyone say anything that led you to believe that you were being terminated because of your age?
A. Well, the thought actually crossed, yes.
Q. Did anyone say anything that led you to believe that?
A. No. There was no reason given.
Q. Okay. Did anyone say anything at that meeting that led you to believe that it was because of your gender that you were being terminated?
A. No.
Q. Prior to your termination, did anyone say anything that led you to believe that you were being terminated because of your age?
MS. SAMMARTINO: Objection.
A. Could you repeat that.
Q. Prior to your termination, had anyone in management said anything that led you to believe that your termination was due to your age?
MS. SAMMARTINO: Objection.
A. I'm sorry. I don't understand that question.

Q. And other than what you have just testified to, are there any other reasons that you believe your termination was based on your age that we haven't discussed?

A. Could you repeat it? I'm sorry.

Q. Well, there are a list of things in Interrogatory Response Number 6 of examples that you have provided of incidents, and I want to determine which if any of those you believe were based upon your age. For example, you say that your car was keyed.

A. Yes.

Q. Do you believe that was based on your age?

A. No.

Q. Do you believe that was based on your gender?

A. It was based on -- it wasn't based on either one of those.

Q. Okay. Do you know who did it for certain? I mean, do you know who did it?

A. No.

Q. Okay. And you didn't witness it being keyed, did you?

A. No, I did not. It happened right after the Regina incident though.

Q. And you said that you were being attacked and crucified?

A. Right.

Capital Grille?
A. Never. No.
Q. How did you -- were you referred to Ms. Factor? How did you find her as an attorney?
A. No. I sought -- I found her actually in the phone book.
Q. Had you known anyone who'd used her services before?
A. No.
Q. Now, you requested -- you have alleged that you requested reinstatement from the company?
A. Yes, I did.
Q. When did you do that?
A. Soon after I left. I wrote a letter to Capital Grille. I made a second request. Actually, Cathy Sammartino made a request at the hearing that I be reinstated as well.
Q. Was that at the unemployment hearing?
A. At the unemployment hearing, yes.
Q. And who did you make the request to?
A. Ken Osgood.
Q. Were all of the requests addressed to Ken Osgood?
A. No. Mine was written to -- I believe the director of operations. I can't recall his name.
Q. Was it someone outside Rhode Island?
A. Yes. It was addressed to the Atlanta office, the

record for a minute?

(DISCUSSION OFF THE RECORD)

Q. Ms. Elliot, I'm showing you what's been marked as Defendant's Exhibit I. Do you recognize that document?

A. Yes.

Q. Who is it addressed to?

A. Linda Elliot.

Q. Who is it from?

A. It's from Toni Jones, senior director of employee relations.

Q. And is this a letter that you received in response to your reinstatement request when you read the text of it?

A. Yes. It appears so.

Q. And what was the company's response to the reinstatement request?

A. That they'll stand by the original decision.

Q. Okay. Does it say that they've reviewed the circumstances surrounding the termination?

A. Yes. But no one ever contacted me regarding what happened.

Q. But the letter is giving you a response to your request for reinstatement, correct?

A. Yes.

Q. Okay. And did anyone ever say that you were being terminated in retaliation for complaining about the incidents with either Mr. McDonald or Mr. Moren?
A. I believe the reason I was terminated was because I made complaints to management about other servers and also I was terminated because other servers made false statements against me. That's the reason I believe I was terminated.
Q. And that's your belief, but are there any statements that were made by anyone in management at the Capital Grille that leads you to believe that?
MS. SAMMARTINO: Objection. Asked and answered.
A. I believe I already said that when I did approach management about any concerns or problems that I had I was told to -- that they did not want to hear any complaints from me again.
Q. Was there anything said at the meeting of termination that your termination was based in retaliation for your having complained about Mr. McDonald or Mr. Moren?
A. I'm sorry. Go ahead.
Q. Did Mr. Osgood or Mr. Lydon say anything at the meeting informing you of the termination of your employment that your termination was in retaliation

for your having complained about Mr. McDonald or Mr. Moren?
A. No. I asked him for a reason, and he wouldn't give me one. He told me that I would hear it in a letter.
Q. Yet you wanted to go back to work at the Capital Grille?
A. Absolutely. I did.
Q. Why?
A. Because I enjoyed working there. Other than the times that I was being harassed, I truly enjoyed my job. I enjoyed good benefits. I enjoyed good income. And I had a good loyalty from my clients. I had good working hours as far as the days, days that I was working. And the seniority that I had there, it was a great place to work other than the times that I was being harassed by Rob Moren and Tom McDonald and Regina.
Q. And Regina was harassing you as well?
A. Well, what I mean by that is -- yes. They -- they had it in for me. They wanted to see me fired. This was what all the complaints about me to management was about, it was about getting me fired.
Q. Do you think Regina wanted to see you fired because you were a woman?

A. Possibly.
Q. Did she ever say anything to make you believe that?
A. She did make statements that she did want me fired, yes.
Q. What statements did she make that she wanted you fired because you were a woman?
A. Not necessarily because I was a woman. It was because they -- they wanted my position.
Q. It almost didn't matter who you were, did it?
A. It didn't matter who I was, exactly. Well, yes. But with --
Q. They wanted the status that you had?
A. Exactly. They resented my position.
Q. Right. I mean, that's really what it was about, wasn't it?
A. That is what it was about.
Q. When you filed the charge, did you discuss filing that with anyone else other than your attorney?
A. No.
Q. Did you notify your husband you were filing a charge?
A. No.
Q. Okay. Did you tell any of your friends you were filing a charge?
A. No.
Q. So just you and your attorney were the only ones aware

A. What really triggered that was when I received the card from Rob Moren with all the slurs in there about me being fired at 60, about me being a bastard, a bitch, a queen.

Q. So it's the card you assume --

A. Monkey woman.

Q. -- that you believe came from Rob Moren, and I mean, it's an unsigned card that you received that you believe came from Rob Moren, and that came at what time?

A. That came right around Christmas.

Q. That was three months after you had lost your job at the Capital Grille?

A. Yes. The harassment still continued after I had left the Capital Grille.

Q. You hadn't seen him in that three-month period, correct?

A. No.

Q. And you hadn't had any communication from him during that three months?

A. No. No. No.

Q. All right. Do you have a sense of approximately how much weight you gained during that period?

A. Oh, I'd probably say about 25 pounds.

Q. Okay. Was any of that do you believe due to less