# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINDA ELLIOT<br>Plaintiff,<br><br>v.<br><br>RARE HOSPITALITY, INC.,<br>d/b/a THE CAPITAL GRILLE<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 05-479-ML |

**PLAINTIFF LINDA ELLIOT'S ANSWERS TO DEFENDANT RARE HOSPITALITY, INC.'S FIRST SET OF INTERROGATORIES**

Now comes the Plaintiff, Linda Elliot ("Elliot") and, pursuant to Rules 26 and 33 of the Federal Rules of Civ. P., hereby responds to Defendant Rare Hospitality, Inc. d/b/a The Capital Grille ("Capital Grille)'s First Set of Interrogatories as follows.

**GENERAL OBJECTIONS**

The answer to each Interrogatory is subject to the General Objections set forth below. These limitations and objections form a part of the answer to each Interrogatory, and are set forth in this manner to avoid duplication and restatement of them for each response. These General Objections may be specifically referred to in response to certain Interrogatories for the purpose of clarity. However, failure to specifically incorporate a General Objection is not a waiver of the General Objection. The plaintiff, Geraldine Aiello generally objects to the Defendant's Interrogatories on the grounds that:

1. Defendants' Interrogatory may seek information which contains or constitutes the thought process of plaintiff's counsel, and/or which are protected by the attorney-client privilege and/or work product doctrine.

enjoyed while at the Capital Grille until 2005, after I had switched careers and became a realtor.

**INTERROGATORY NO. 6:**

Identify each and every occasion on which you complained to any employee, agent or representative of The Capital Grille about any alleged discrimination against you, stating for each the date on which the complaint was made, the person to whom the complaint was made, the form of the complaint (e.g., letter, in-person meeting), the substance of the complaint, and the identity of any other persons who were present when the complaint was made.

**ANSWER TO INTERROGATORY NO. 6:**

While I do not believe that I can recall with specificity the precise details of each and every complaint that I have made to representatives of the Capital Grille over the years, I do know that I complained repeatedly to members of management, and can specifically recall several of my complaints.

In 1998, I reported a server, Anthony Dichiarro, for making inappropriate statements to me. Although it seemed that Mr. Dichiarro should have been reprimanded for his comments, I was under the impression that I was the one who was viewed negatively for having reported him. I made my report to General Manager Ken Osgood. Mr. Osgood prepared a memorandum in response to my complaint. I do not believe that any further action was taken in response to my complaint, as I heard nothing further about the matter.

On November 7, 2001, a server, Regina Curan, who was friendly with the male servers who were harassing me, got upset when I asked her if she had the salads I just had made. She then, when I was taking more salad from the refrigerator, reached into it, over me, to grab some, and some of the salad hit me in the face. Later that night, I overheard Tom McDonald tell Regina something along the lines of "She is pushing you? Call the

(corporate) 800 number." The next day, on November 8, 2001, Regional Director of Operations Brian Foye gave me a written warning and "last change agreement" as a result of the incident. I had never received a warning of any type prior to this "Last Chance Agreement," in violation of the Capital Grille's progressive discipline policy. *See* December 1999 RARE Hospitality Handbook ("RARE"), at p. 25 - 26 ("...progressive discipline will be administered (i.e., verbal counseling, written warnings, and/or termination) based on the nature and severity of the circumstances). In receiving the "Last Chance Agreement," an investigation never occurred with regard to my version of events. The server, Regina, falsely told management that I had engaged in "pushing and shoving." I told Brian Foye that I never pushed anyone. I was advised by Mr. Foye that if I did not sign the "Last Chance Agreement," I would be terminated. I signed the agreement "under duress."

On November 8, 2001, I wrote a memo to Brian Foye, memorializing my version of events about Regina. Shortly after, I told General Manager Ken Osgood that I never pushed Regina. He told me in that conversation that he knew the servers "taunted" me and that I got "a bum rap."

Also shortly after the "Regina incident," my car was "keyed" in the Capital Grille parking lot. I also brought this to the attention of General Manager Ken Osgood.

Since the incident with Regina, I was subjected to more frequent incidents of harassment. For example, my guest checks would get merged by someone with access to my computer pass code. To effectuate a merge, three or four steps needed to take place. It is not something that happens by accident or without effort. This required me to request a manager to help me "undo" the merged checks. It made my guests upset (due to delay

in receiving their checks) and made me look foolish in front of management. Each time I had to undo a merged check, I would discuss the problem with the manager on duty who had to address the issue, and requested that he take steps to prevent further occurrences, and requested that my pass code be changed. I spoke in this regard with Steve Lyden, Ron Mezza, and Ken Osgood.

Robert Moren and Tom McDonald would interfere with my ability to perform my job. They would say, within my presence, that they were disappointed that I had not been fired due to the Regina incident. From late 2001 until my termination, servers Robert Moren and Tom McDonald would repeatedly, almost daily, tell me "Don't push me," "Don't shove me" and/or "You've been warned." I would tell them that I was not bothering anybody and was just doing my job. They would not move from the computer, even though they had completed their work on it. I would ask them to move and they would not. This happened several times. I brought this to the attention of General Manager Ken Osgood and asked that he prevent the conduct.

On three to four occasions, also following the Regina incident, I overheard Tom McDonald and Robert Moren discussing "pushing and shoving." In the same context, they discussed that they would "get her." I understood that "her" was me, and that they wanted me fired. I also overheard them refer to me as "the evil one" and "bitch." Almost nightly, during cash out, Robert Moren would refer to me directly as "bitch." I tried to ignore him. I believe that I spoke with Ken Osgood about Robert Moren's behavior.

On May 23, 2002, I observed Tom McDonald pour milk inside of the refrigerator that I just had cleaned. I showed the poured milk to the manager on duty, Steve Lyden. He told me he would talk to Ken Osgood, and told me to clean up the milk. The next

day, Ken Osgood met with me and told me that Tom McDonald claimed that I had "pushed and shoved" him the night before. At that time, I presented Ken Osgood with my memo about the milk. I told him that I never pushed Tom or anybody else, that it was all backwards. I told him that I was the one who was being attacked and that they wanted to get me fired. I told him that I was being crucified. Ken Osgood reprimanded me and stripped me of my duties as Head Server. He did not, to my knowledge, ever investigate the milk incident or discipline Tom McDonald. I told Ken Osgood that the next thing that would happen would entail Rob Moren making a complaint against me (for pushing and shoving).

During my meeting with Ken Osgood on the Tom McDonald incident, Ken told me that he never again wanted to hear anything more about pushing and shoving. Based on this statement, and because he demoted me, I knew then that I would not get help from him.

The harassment continued. I tried to do my job and to ignore the harassment. It was clear that if I complained further, my job would be jeopardized.

On September 21, 2002, I was returning dirty glasses to the service bar. Rob Moren was there and as I approached him I called out "behind you, coming in on your left." His left arm came across me, preventing me from setting the glasses on the counter. I stood there. He said something like "You bitch. You should say excuse me." I set the glasses on the counter and left. I believe I told him something like "I already excused myself." As I was leaving toward the dining room, he followed behind me, and said "lick my dick." He said other things, but I cannot remember what they were. At

some point I said "Knock it off." Later that night, I heard Rob Moren and Tom McDonald at the bar talking about "pushing and shoving."

At the end of the evening, as I was conducting the cash out with my manager, Steve Lydon, I asked to speak with him about Rob Moren. I told him I was emptying glasses and Rob Moren extended his arm to stop me. I told him that Rob had said disgusting things to me. Steve said he would speak with Ken Osgood.

On September 26, 2002, Ken Osgood fired me. At that time, I told him again that I never pushed or shoved anyone. He told me that I had a track record for pushing and shoving, and referenced the Last Chance Agreement and the Tom McDonald Incident.

Discipline at the Capital Grille was not applied proportionately, fairly, or in accordance with established policy. For example, there never were investigations of the complaints that I made, verbal or in writing. I was fired in order that men who resented me could assume my job responsibilities. Management did nothing to protect me and effectively looked the other way.

Following my termination, on January 21, 2003, at the Department of Labor proceedings on the issue of whether I could collect unemployment benefits, my attorney provided the Capital Grille with a copy of a report prepared by Pauline Patchis, a handwriting expert, and advised him that Ms. Patchis had determined that server Rob Moren had written a "hate card" that had been sent anonymously to my residence at Christmas 2002. At that time, my attorney requested that the Capital Grille reinstate my employment, and reopen any investigation that it had conducted concerning the

complaint made by Rob Moren that led to my termination. To my knowledge, no further investigation ever occurred.

**INTERROGATORY NO. 7:** State whether you have ever made a claim at any other time against any other current or former employer for discrimination on the basis of gender or other grounds. For each such instance, state the name of the employer, the nature of your claim, and the current status or disposition thereof.

**ANSWER TO INTERROGATORY NO. 7:**

I have never made any claim against any employer other than the Capital Grille.

**INTERROGATORY NO. 8:**

Describe in detail all monetary damages that you allege you have sustained as a result of the allegations made in your Complaint in this action. With respect to any claims for back pay and/or front pay, lost benefits, or pain and suffering indicate the manner in which any such amount was calculated.

**ANSWER TO INTERROGATORY NO. 8:** Plaintiff has not yet verified her lost earnings and shall supplement this interrogatory to provide such information. As for lost benefits, however, I participated in the Capital Grille's medical, dental and vision plans at the following annual costs:

Medical - $66.70 per pay period, total $3,468.40 per year;

Dental - $7.26 per pay period, total $377.52 per year;

Vision - $1.58 per pay period, total $82.16 per year;

Thus, my total benefits costs were $3,946.08. I currently pay approximately $11,000 for medical and vision benefits only. I have determined that the average cost of family dental plans is $2,000. Therefore, the annual value of my lost benefits is not less than $9,531,60 per year.

I also no longer have the benefit of 401K matching, which was available to me at the Capital Grille.

admitted that the male servers were harassing me, but failed to do anything about it. Further, the Capital Grille retaliated against me when I continued to complain about the harassing conduct, including the issuance of a written warning in contravention of the Capital Grille's progressive discipline policy, termination of my employment in violation of its progressive disciplinary policy, and refusal to consider my reinstatement requests, despite evidence, in the form of the "hate card" and handwriting expert's report, that Mr. Moran – the person whose false complaint led to my termination - was motivated by discriminatory animus.

Further, the Capital Grille also failed to hire and promote female servers in proportion with their representation in the community.

Linda Elliot

**NOTARY PUBLIC**
*State of Rhode Island*
*County of* Providence

In Providence on the 26th day of April, 2006, before me personally appeared Linda Elliot, to me known and known by me to be the person executing the foregoing instrument, and she acknowledged said instrument, by her so executed, to be her free act and deed.

Notary Public

As to Objections:

Catherine A. Sammartino
R.I. Bar No. 4762
Sammartino & Berg, LLP
128 Dorrance Street, Suite 400
Providence, RI 02903
(401) 274-0113