# EXHIBIT H

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE, SC. SUPERIOR COURT

* * * * * * * * * * * * * * * * *
LINDA ELLIOT *
VS. * C.A. NO. 05-049ML
RARE HOSPITALITY, INC., d/b/a *
THE CAPITAL GRILLE *
* * * * * * * * * * * * * * * * *

DEPOSITION of ROBERT MOREN, taken on behalf of the Plaintiff on Tuesday, October 10, 2006, at the offices of Sammartino & Berg, 128 Dorrance Street, Suite 450, Providence, Rhode Island, commencing at 11:00 A.M. before Rebecca J. Forte, Notary Public.

APPEARANCES

SAMMARTINO & BERG
BY: CATHERINE A. SAMMARTINO, ESQ....FOR THE PLAINTIFF
EDWARDS, ANGELL, PALMER & DODGE
BY: SHERYL HANLEY, ESQUIRE..........FOR THE DEFENDANT

ALSO PRESENT
Linda Elliot

IRONS & ASSOCIATES
CERTIFIED PROFESSIONAL STENOGRAPHERS
11 South Angell Street #359
Providence, Rhode Island 02906
(401) 861-0909



INDEX

WITNESS FOR THE PLAINTIFF PAGE NUMBER
ROBERT MOREN
EXAMINATION BY MS. SAMMARTINO........... 3
EXAMINATION BY MS. HANLEY...............91

EXHIBITS

(MARKED PLAINTIFF FOR IDENTIFICATION)

NO. DESCRIPTION PAGE NUMBER
1 Verbal Counseling Verification......44
2 Verbal Counseling Verification......44
3 6/18/04 handwritten statement.......48
4 Drawing............................64
5 6/17/2004 signed written agreement..74
6 Three-page mailing to Linda Elliot..81



Tuesday, October 10, 2006
(Commencing at 10:00 A.M.)
ROBERT MOREN
Being duly sworn, deposes and testifies as follows:
EXAMINATION BY MS. SAMMARTINO

Q Good morning, Mr. Moren. I am Catherine Sammartino and I represent Linda Elliot in an action currently pending in the United States District Court for the District of Rhode Island against RARE Hospitality, also known as The Capital Grille.
Have you ever had your deposition taken before?
A No.
Q Okay. I am going to go over some of the ground rules for the deposition testimony.
First of all, the woman who is on your right, Rebecca Forte, is the stenographer. She is recording every word that I say and every word that you say. Because she can only record words, it's important that when you answer a question that I pose to you, that you answer verbally rather than nodding of your head. Also, please refrain from saying uh-hum or uh-un, because that's hard for her to record as well.



A Okay.
Q If you don't understand any question that I ask of you, just let me know and I will rephrase it for you. If you need a break, let me know and we can take for break. I don't expect to be taking too long today in terms of my questions to you.
A Okay.
Q Also, you are under oath. I wish to remind you of that. It's very important that you ensure that your answers are truthful and accurate.
A Okay.
Q Ready to go?
A Yes.
Q When I refer to The Capital Grille in my questioning of you, I mean The Capital Grille restaurant located in Providence, Rhode Island. If I'm referring to another branch or office of the company, I'll let you know, okay?
A Okay.
Q What is your current address?
A Five Middleton, M-I-D-D-L-E-T-O-N, Road, Bristol, Rhode Island.
Q And with whom do you live at that residence?
A Alone.

Page 61

Q Okay. So, you saw Steve Lydon at the upper level?
A Uh-hum.
Q Where exactly was he?
A He was talking to a table in one of the stations upstairs in Station 16.
Q Could you draw for me, because I'm trying to understand this --
A Uh-hum.
Q -- where you were when Linda shoved you.
A Okay.
Q You can use my pen.
A Okay. This is the service bar. I don't want to draw this too big. I want to try to make a smaller version. This is the service bar, the bar area, post stand, meat locker, wine kiosk.
Q Do me a fever --
A Draw it better?
Q No, not draw it better. Just identify this as the service bar.
A Okay.
Q That is where the push occurred, right?
A Right, exactly.
Q Okay.
A You walk up this way, the kitchen is here, the upper

Page 62

level is up here.
Q Can you identify kitchen here? And this is the upper level?
A Upper level.
Q Okay. Let the record reflect that he's identified the kitchen with the letter K, the service bar with the letters SVB, and --
A Upper level.
Q "UL" is the upper level. And, if you could identify these areas as well.
A This is meat locker.
Q Okay.
A Wine kiosk. I don't know how you spell kiosk. Stand.
Q What is --
A Host stand.
Q Oh, host stand?
A Yes.
Q So, host stand is identified as host. All right. Now, where you've marked this diagram with an X, is that where you were standing?
A Yes.
Q And your testimony is that Linda Elliot came up from behind you?

Page 63

A From behind me, down this hallway. I am guessing she came from here.
Q Did you see her arriving?
A No.
Q Okay.
A Because I didn't even know who shoved me. I had to turn to see who was pushing me, and she came up here.
Q She came to your left?
A To my left, right.
Q And what is over here? This is all part of the bar?
A Yes.
Q And I'm referring to --
A These glasses here, and this is -- that's what she was supposedly doing, bringing in dirty glasses, which you stack over here on the side of the bar.
Q Could you put glasses here so I can remember this when I look at it later.
(WITNESS COMPLYING)
Q So, she came behind you and shoved you?
A Yes.
Q And then who walked away first? Who walked away first?
A She. After the incident?

Page 64

Q Yes.
A She did.
Q And where did she go?
A She walked down here, and I think she went to the kitchen, and I went straight up to the upper level with my drinks.
Q Could you draw an arrow to where Linda Elliot went and put her initials, LE. And, if could you draw where you went, an arrow and put your initials. Thank you.
MS. SAMMARTINO: I'm going to have this marked as Exhibit 4.
(Whereupon Plaintiff's Exhibit 4 is marked for identification.)
Q Okay. All right. So, you went to see Steve Lydon?
A Uh-hum.
Q And what did you tell him?
A And, again, remember, this is 9:00 o'clock in the middle of a Saturday night.
Q I understand.
A So, I went up, after I served my drinks, I got Steve on the side and I said, "Steve, you need to know that Linda Elliot just pushed me and called me a queer twice." He said, "Oh, my God. Oh, no.

You're kidding." I had said, "Steven, I know it's busy. It's the middle of the night." I said, "That woman's opinion means nothing to me, but you need to know what she said." So, he just said, "Oh, my God," this and that. "Okay, okay." And, again, I don't remember. So, that was it. I just went about my business, worked the rest of the night.
Q Okay. So --
A And, I think he said, I'll have to talk to Ken, or I'll talk to Ken, but I'm not 100 percent sure if he said that.
Q Was Ken Osgood there that night?
A No, Ken Osgood was not.
Q So, what happened after that?
A So, then I worked Sunday, but neither of them was working. The manager on was Ron Mezza, so I didn't mention it to him. I didn't want to get into it again. It was bad enough. I was already upset about the whole incident. And, so, the following, I want to say Monday or Tuesday, Ken Osgood spoke to me and asked me what happened.
Q Does Mr. Osgood typically work on weekend nights?
A Yes. When he was the gentleman, now he's regional, but at the time he was a general manager, he did.



Q And did he ask you at that point to prepare a statement?
A I don't remember if it was that day or maybe the next day when I came in, because I don't -- again, I know when I wrote it up, I think it was on a Wednesday, so the only reason I'm saying I don't think I waited to speak to Ken until the Wednesday was because I must have, I worked Monday and I had worked, maybe I didn't work Tuesday, but I don't remember if the exact -- I want to say, yeah, I think it had to be when I spoke to him the first time that I had to write that up.
Q And --
A I don't know whether he talked to Linda first and then I wrote it up, or. Again, the time, I'm not exactly sure.
Q Well, you saw Mr. Osgood sometime early the following week after the incident occurred --
A Right.
Q -- and you had a meeting with him, was anyone else present at the meeting?
A I don't remember if Steve Lydon was in the room, also. He could have been.
Q And you indicated that Mr. Osgood asked you what



happened. Were there any other questions that you can recall that Mr. Osgood asked of you?
A No. I, like I said, I just went over in detail the whole incident, what had happened, and...
Q Did he ask you what you felt would be an acceptable resolution?
A No.
Q Did he say anything about whether he had spoken with Linda Elliot about the situation?
A No. But, I remember saying, I don't even expect anything to come of this, I said, but I need to -- I need to have this documented.
Q That was your initial meeting with Mr. Osgood?
A Yes.
Q By the way, is E. Anthony homosexual?
A Yes.
Q And is he openly homosexual?
A Yes.
Q And, forgive me if I've asked this already, but I'm trying to keep track of all of these people, E. Anthony no longer works at The Capital Grille?
A Right, and he had left in '98.
Q Okay. Did you meet with Mr. Osgood again that week following the incident to discuss this situation?



A I don't remember. I don't think so. I think the last meeting I had was when I wrote this statement.
Q What happened after that?
A Again, the timetable, I'm a little fuzzy. I don't know whether she was terminated that week or it was the following week. I don't know the exact dates.
Q But at some point --
A Because I don't think I did work with her again after that incident. I don't remember working with her again, and I don't think they would have allowed either one of us to work with each other. So, I'm not sure.
Q Okay. Following the incident with Ron Corbett, were you allowed to work with him?
A Yes.
Q And was that throughout the aftermath of that incident, or did it only occur after they had finished the investigation, if you know?
THE WITNESS: Could you explain that again?
MS. SAMMARTINO: Let me try it again.
Q At any point in time were you separated from Mr. Corbett in terms of your shifts?