UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINDA PLAINTIFF<br>Plaintiff | : | |
| v. | : | C.A.NO.: 05-479ML |
| RARE HOSPITALITY, INC. d/b/a THE CAPITAL GRILLE<br>Defendant | : | |

**PLAINTIFF, LINDA PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Now comes the Plaintiff, Linda Plaintiff ("Plaintiff" or "Plaintiff"), pursuant to Rule 56 of the Federal and Rhode Island Local Rules of Civil Procedure, and submits this Memorandum of law in opposition to the Motion for Summary Judgment of Defendant, Rare Hospitality, Inc. d/b/a the Capital Grille ("Defendant" or "Capital Grille").

This case involves the summary termination of a Plaintiff from her long-term position as a server at the Capital Grille in Providence, Rhode Island. Plaintiff maintains that this termination was in violation of the Rhode Island Fair Employment Practices Act ("FEPA"), R.I.G.L. § 28-5-1, *et seq*., and the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. §42-112-1 *et seq*. Specifically, Plaintiff was wrongfully terminated on the basis of her gender. As set forth below, several issues of material fact exist that render summary judgment inappropriate in this matter.

## II. FACTUAL SUMMARY

Despite Defendant's assertions to the contrary, Plaintiff Linda Plaintiff maintains that her summary termination from The Capital Grille, after twelve years of stellar employment, was based on her gender.

Plaintiff worked as a server at The Capital Grille Restaurant in Providence, Rhode Island. After only one year of employment, she was promoted to the position of head server, a position held by only one other woman in the Providence location during Plaintiff's lengthy tenure. Plaintiff enjoyed many benefits in this position, including preferential shifts; specifically highly popular seating areas within the restaurant and lucrative weekend shifts.

For the most part, Plaintiff enjoyed her employment at The Capital Grille. In her last two to three years of employment, however, she began to experience serious problems with certain male servers, including Tom McDonald and Robert Moren. These servers regularly referred to her in a derogatory tone as "the queen." Server Robert Moran, who advised that he would "get her," repeatedly referred her to as a "bitch" and "hag." Mr. McDonald was hired by Capital Grille in 1998; Mr. Moran was hired in 1999.

Plaintiff reported these and other problems to Defendant's General Manager, Ken Osgood. Plaintiff also reported the problems that she was experiencing to managers Ron Mesa and Steve Lydon. Nonetheless, Defendant overlooked Plaintiff's complaints, failed to take appropriate corrective action, and, at times, blamed Plaintiff for the problems she endured.

Over time, Plaintiff's problems escalated. Servers would "bump" or "fall" into her, then accuse her of "shoving" them. A server contacted Defendant's hot line and

falsely reported that Plaintiff had shoved them. Plaintiff was subsequently disciplined for shoving. Her customer orders were accessed, altered, or even deleted on the Defendant's computer system, resulting in embarrassing mistakes, confusion and service delays.

Plaintiff continued to raise complaints with management, which continuously failed to take prompt and effective remedial action, or any action at all. She was retaliated against for her complaints. Shortly following one of her complaints, Plaintiff was demoted from head server and replaced by a male. Plaintiff ultimately was terminated, on or about September 26, 2002, on the heels of another complaint about Robert Moran, the server who repeatedly had harassed her.

Simply put, Defendant tolerated and condoned a discriminatory work environment. The servers about whom Plaintiff complained, likely emboldened by Defendant's failure to take any action in response to Plaintiff's complaints, concocted their own allegations against Plaintiff. Their harassment toward Plaintiff escalated.

In connection with her numerous complaints about discriminatory treatment, Plaintiff never was advised to reduce her complaints to writing. She also was advised by General Manager Kenneth Osgood that she was forbidden from bringing her complaints to the attention of Defendant's corporate headquarters, in contravention of the Defendant's employee handbook, which allows employees to bring their complaints either to their managers or to corporate headquarters, without restriction.

Conversely, when Robert Moren made a complaint against Plaintiff in September 2003, the same evening that Plaintiff complained about Moren's impeding her from access to the bar area, and making derogatory comments, Moren was advised to reduce his complaints to writing, and his written complaint was used as the basis for Plaintiff's

termination. Plaintiff was never given the instruction to prepare a written document, despite her having made a complaint *at the same time as Moren*, and despite the fact that her complaint represented another of a series of grievances involving Moren.

This disciplinary and investigative disparity becomes more clear when one considers the complaint made by Ronald Corbett against Robert Moren. Ronald Corbett also was advised by management to reduce his complaint to writing; this complaint then was forwarded to corporate headquarters.

Ellliot was clearly and directly prevented from engaging in this process, thereby insulating male servers from disciplinary measures in response to her (disregarded and undocumented) complaints, and encouraging them to continue their campaign of harassment against her.

In response to Ronald Corbett's 2004 complaint against Robert Moren, which literally mirrors the complaints Plaintiff made in 2001- 2003, the Capital Grille gave Moren a "last chance agreement" following Corbett's complaint, despite the fact that he had a record of previous verbal and written warnings, including a "second written warning," which is the precursor to termination, or a "last chance agreement". In essence, Moren was given two last chances – a "second written warning" AND a "last chance agreement" - whereas Plaintiff, who had nine more years of employment tenure than Moren, received a last change agreement only, without the benefit of prior written discipline, and followed by termination.

Two months after her termination, Plaintiff received an anonymous piece of "Hate Mail," in the guise of a Christmas Card. The card contained handwritten block print text as well as excerpts cut from newspapers or other media, and referred to her in derogatory

terms aimed at her sex and age: "monkey woman,' "ugly, sexless, no class hag (what everybody at the Grille says)" and "fired at 60!! HA HA." Plaintiff shared the "Hate Mail" with General Manager Ken Osgood shortly after she received it. She also reiterated the other instances of hatred toward her, including vandalism of her vehicle while on the Defendant's premises, and shared her belief that the male servers' unchecked conduct had been designed to secure either her resignation or termination.

Upon information and belief, and consistent with its previous inaction in the wake of Plaintiff's complaints, Defendant failed to investigate the "Hate Mail" incident and did nothing to discipline Robert Moran, nor did it take any other remedial action.

Following her termination, while at an appeal hearing at the Rhode Island Department of Labor in connection with Plaintiff's entitlement to unemployment benefits, Plaintiff, through counsel, shared with General Manager Ken Osgood a copy of a report by Handwriting Expert Pauline Patchis, in which a determination was made that Robert Moren had authored the Hate Mail. At that time, Plaintiff requested that an investigation of her termination – based on alleged statements she had made to Mr. Moren – be conducted and that she be reinstated.

Defendant refused to rehire Plaintiff, despite the fact that it apparently had terminated her based on a statement made by Robert Moran, the person about whom she had repeatedly complained, and whose very comments about which she had complained were repeated in the Hate Mail.[1]

The Defendant's actions were motivated by malice and ill will toward Plaintiff, and were taken with callous and reckless indifference to her statutorily protected rights,

---

[1] Interestingly, the Hate Mail contains the statement "Fired at 60!! HA HA." This statement is similar to the statement made by Moren to Corbett, that he was nothing more than a 60 year old waiter. Both Elliot and Corbett are in their 50's. In essence, the remark is Moren's "signature."

the standard for punitive damages recovery in Title VII and RI FEPA cases. As such, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied in this matter.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides, in pertinent part, that a court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In ruling on a summary judgment motion, the Court must view the record and draw inferences in a light most favorable to the nonmoving party. Pignons S.A. v. Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 486 (1st Cir 1981). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue of any material fact . . . and the moving party is entitled to judgment as a matter of law." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994).

According to Justice Nancy Gertner of the District of Massachusetts, **"the ultimate question of fact in discrimination cases – an actor's state of mind – is a highly nebulous concept and thus, most difficult to resolve on summary judgment."** Scott v. Sulzer Carbomedics, et al., 2001 U.S. Dist. LEXIS 8799, *citing* Rosen v. Thornburgh, 928 F. 2d 528, 533 (2nd Cir. 1991) (in employment discrimination cases, "where an [employer's] intent and state of mind are placed in issue, summary judgment is

ordinarily inappropriate"); *see also* Poller v. Columbia Broad. Sys., 368 U.S. 464, 470, 473, 7 L.Ed 2d 458, 82 S. Ct 486 (1962) (Summary judgment procedures should be used "sparingly" where the issues of motive and intent play "leading roles"); Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (Determinations of discriminatory intent are questions better suited for a jury). As such, Defendant's motion for summary judgment should be denied.

## IV. LEGAL ARGUMENT

### A. Defendant's Motion for Summary Judgment Should be Denied as She is Able to Allege Sufficient Facts to Support Her Gender Discrimination Claims.

Plaintiff alleges that Defendant engaged in gender discrimination in violation of the Rhode Island Fair Employment Practices Act, R.I.G.L. § 28-6-1 et seq.

The State Fair Employment Practices Act (FEPA) prohibits an employer from either discharging an employee or discriminating against an employee with respect to "terms, conditions or privileges of employment" based on that employee's sex or disability. R.I.G.L. §28-5-7(1)(i),(ii); DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 20 (R.I. 2005).

Plaintiff's gender discrimination claims are based on theories of hostile work environment, disparate discipline, disparate treatment of employee complaints, and retaliation. As is set forth in greater detail below, Plaintiff can establish through sufficient proof that she experienced gender discrimination during her Capital Grille employment.

### B. Plaintiff has Established a *Prima Facie* Case Against Defendant.

Plaintiff bears the burden of proving her gender-based hostile work environment claim, through the production of competent evidence, that satisfies each of the following

elements: (1) the employee is a member of a protected class; (2) the employee was subjected to unwanted harassment; (3) the harassment was based upon her sex; (4) that the harassment was sufficiently severe and pervasive so as to alter the conditions of plaintiff's employment and create an abusive environment; (5) the harassment was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) some basis for employer liability has been established. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

Under the five prong test of O'Rourke, Plaintiff is easily able to prove a *prima facie* case of harassment. Plaintiff, a female, is a member of a protected class. She was subjected to the unwanted and chronic harassment of male co-workers who were resentful of a female being in a position of power, and who designed a system of lies and pervasive harassment, in the form of derogatory and gender based commentary and improper conduct designed to interfere with Plaintiff's ability to perform her job functions, in order to secure Plaintiff's termination. Plaintiff's employer paid lip service to her multiple complaints about the abusive conduct she endured, and failed to document, process and investigate her complaints, thereby exposing Plaintiff to a continuous and unfettered cycle of harassment. Similarly situated males who made complaints – Robert Moren and Ronald Corbett - were treated differently. A reasonable person would not tolerate an environment in which she regularly is referred to as a "bitch" "Queen" and "hag," and in which her tormentors are emboldened by their employer's deliberate lack of involvement in the matter. After enjoying many years of a healthy working environment, and commencing with the acquisition of the Capital Grille

by Rare Hospitality, Inc., the infusion of new management, and the hiring of new male servers, Plaintiff was subjected over a period of more than two years to chronic offensive verbal abuse and other conduct that was repeatedly overlooked and disregarded by the management of The Capital Grille, resulting in severe financial and emotional harm.

For these reasons, summary judgment is inappropriate in this matter and should be denied.

1. **The Harrassment that Occurred in this Case was Based Upon Plaintiff's Gender**

The harassment endured by Plaintiff in this matter was predicated upon her co-worker's resentment about dealing with a female in a position of power, both in terms of authority (Plaintiff's head server role) and profit (in the form of the preferred shifts and seating areas conferred to head servers). The mistreatment that Plaintiff endured at the hands of her co-workers started with gender-based name calling ("bitch," "Queen," "hag"), and turned into fabrications of assault of co-workers designed to secure Plaintiff's departure. Plaintiff was ultimately terminated as a result of these false accusations. Her requests for additional investigation and reinstatement with regard to her termination were ignored, despite the fact that Plaintiff provided to Defendant compelling proof - in the form of discriminatory Hate Mail containing terms identical to those used against her by Moren during her employment, and an expert handwriting analyst's opinion that Moren had authored it - that Robert Moren had in fact been harassing her all along.

Plaintiff's position in this regard, and Defendant's improper disregard of her is underscored, in light of Moren's 2004, hate-infused, derogatory and discriminatory comments and conduct toward another sever, Ronald Corbett, based upon Mr. Corbett's sexual orientation and age. Despite Moren's history of hateful and discriminatory

treatment towards Plaintiff, and despite its possession of a handwriting analysis that confirms Moren is the author of the Hate Mail, Defendants elected to provide Moren with his second "last chance" when confronted with the Corbett discrimination complaint. Conversely, Plaintiff received one "last chance," unpreceded by progressive discipline like Moren enjoyed, followed by termination without a second "last chance." This disparate treatment and discipline substantiates Plaintiff's claims and demonstrates that Defendant's claimed basis for her termination ("pushing and shoving" and/or improper remark to Mr. Moren) is pretextual.

Although Defendants contend to the contrary, Plaintiff was well aware that she was being harassed and ultimately terminated based on her gender. Plaintiff's husband, Robert A. Plaintiff, Sr., testified as follows at his deposition:

> Q. On the day she came home after being terminated,
> Did she say to you that she believed she had been
> Fired because she was a woman?
>
> A. Yes.
>
> Q. What did she say?
>
> A. Said these guys get away with everything down there?
>
> Q. Which guys?
>
> A. This clique that would be bothering her.

(Deposition Transcript of Robert A. Plaintiff, Sr. at 17: 7-17).

Moreover, within three months of her termination, Plaintiff informed her personal physician, Dr. Gaines, that she was harassed and ultimately terminated from her employment based upon her gender. Dr. Gaines testified as follows at his deposition:

> A. That she had been fired because she felt that her work
> Environment had been hostile, had been hostile for a

> Prolonged period of time, and to quote my note, she
> Was fired in September when they alleged that this
> Petite woman assaulted a great big man. And I go on
> To say she claimed that they were trying to get rid of
> Her for a long time since they hired a bunch of waiters
> Who were fairly despicable . . .
>
> Q. Did she say why she thought it was contrived, if you
> Recall?
>
> A. My recollection of her position was that because of her
> Gender and because of her appearance, the sense I got
> Is that she was given to believe that her appearance and
> Gender and age were not compatible with the image that
> Her bosses wanted to portray at the restaurant.

(Deposition Testimony of Dr. Gaines, 9: 4—24).

### 2. **The Harassment Endured by Plaintiff was So Severe and Pervasive as to Alter the Conditions of Plaintiff's Employment and Create an Abusive Environment**

Plaintiff is able to succeed on her hostile work environment claim because she is able to prove that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive enough to alter the conditions of the victim's employment or to create an abusive working environment." Harris v. Forklift Sys., Inc. 510 U.S. 17, 21 (1993) (*quoting* Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)). To assess whether alleged harassment reaches this level of severity, courts will "examine all the attendant circumstances including the frequency of discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Id.

Plaintiff endured repeated and long-term (over a period of two years) harassment from a cadre of male co-workers who were determined to see her lose her position of

prominence as a senior status female head server. She endured a barrage of derogatory verbal abuse, such that should never be tolerated in a normal work place, and the fabrications of the very co-workers who harassed her in a successful bid to management that she was so physically abusive (after nine years without incident) to other servers that she should be fired.

Plaintiff's experiences are not unique to her. She also identified instances where male servers – the same ones who repeatedly harassed her – would make derogatory comments to female servers (Monique O'Gara, Helen Roburto, and "Nicole") while they were bending over to sweep floors. These women approached Plaintiff to discuss their concerns, and were advised to relay their concerns to management. Similar to Plaintiffs complaints, no records exist to document these womens' complaints.

In addition to verbal abuse directed to Plaintiff and negative treatment of other women servers, Plaintiff's ability to perform her job functions was compromised. Male servers McDonald and Moren (newly hired in 1998 and 1999, respectively), each would block Plaintiff's access to various areas of the restaurant. Plaintiff's customer orders were accessed on the computer system and her customer orders altered, resulting in irate customers and delays in processing customer checks. Plaintiff brought all of these matters to the attention of management; however, at no time was Plaintiff instructed by management to reduce her complaints to writing, as was done in connection with the complaints of male servers Moren and Corbett. Unlike Plaintiff's complaints, these men's complaints were promptly investigated, documented, and discipline was meted out. In this sense, Defendant negligently or intentionally failed to follow its own harassment policy in connection with Plaintiff's complaints.

Even after she was fired from The Capital Grille, Plaintiff continued to suffer when she received a card filled with derogatory gender-related comments. Again, management at The Capital Grille failed to further investigate, despite Plaintiff's request and despite an expert analysis that the card had been created by Rob Moren, the male employee who had repeatedly harassed plaintiff during her employment and whose false allegations against her, motivated by obvious discriminatory animus, led to her termination.

## C. Plaintiff Need Only Establish a Prima Facie Case To Defeat Summary Judgment Of Her Discrimination Claims.

In its Memorandum of Law, Defendant suggests this Court apply the seminal *McDonnell Douglas* burden-shifting framework, in analyzing its Motion For Summary Judgment.[2]

However, this Court has recognized, "The McDonnell Douglas framework, however, invites trial judges to weigh evidence and assess credibility of witnesses at the summary judgment stage," because "after the plaintiff has set forth a *prima facie* case and the defendant has articulated a nondiscriminatory basis for its actions," the plaintiff is required to demonstrate to a preponderance of evidence that the proffered justification is merely a pretext to discriminate. Gannon, 777 F.Supp. at 169-170. *See also* Eastridge v. Rhode Island College, 996 F.Supp. 161, 165-167 (D.R.I. 1998). Therefore, this Court has held, "If a plaintiff produces facts supporting a prima facie case [of discrimination], then the defendants cannot prevail on a directed verdict or summary judgment motion." Gannon, 777 F.Supp. at 170. For this reason, summary judgment is improper.

---

[2] The analytical framework delineated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which is practically universally applied in the context of state and federal discrimination claims, is well known to this Court. Therefore, for the sake of brevity, it will not be rehashed here.

**D. Plaintiff alleges Sufficient Facts to Support her Retaliation Claim, and as such, Defendant's Motion for Summary Judgment Must be Denied.**

Defendants contend that Plaintiff has failed to put forth a *prima facie* case of retaliation, and as such, her claim must fail. However, under the three prong test utilized by the First Circuit, plaintiff is able to allege sufficient facts to support her claim of retaliation.

In order to prove a *prima facie* case of retaliation, "a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." Calero-Cerez v. United States Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004).

The Plaintiff in this matter engaged in protected conduct when she reported, time and time again, the verbal abuse and fabrications about her "abusive behavior" that she was experiencing in the workplace. She wrote (unsolicited) memos to management to memorialize her version of events, only to be disregarded, chastised and punished by management. Plaintiff's reporting her version of events led to her demotion as head server. Shortly thereafter, she was returned to her position as head server, only to be terminated. It was clear to Plaintiff during her last few months at The Capital Grille that if she complained further, her job would be jeopardized.

Defendant's argument that Plaintiff's retaliation claim is time barred is misplaced. Plaintiff's retaliation claim is based upon her termination, not her demotion. Plaintiff's termination occurred on September 26, 2003. Her Charge of Discrimination was filed well within the statutory timeframe, on July 16, 2003. Thus, plaintiff's retaliation claim

is not time barred. Moreover, Plaintiff's retaliatory demotion can properly be considered by this Court in evaluating Defendant's motives for terminating Plaintiff.

Further, Defendant attempts to assert that Plaintiff's termination was due to her alleged "pushing and shoving" of servers, denied by Plaintiff and described by Manager Lydon as an "elbowing" by Plaintiff of her harasser Tom McDonald, whom Plaintiff maintained refused to move from a computer station; and/or commentary to her other harasser, Mr. Moren, whom Plaintiff claims hurled derogatory insults to her – again – on the night in question. These issues present questions of material fact that preclude the entry of summary judgment.

**E. <u>Plaintiff is able to Develop Sufficient Facts to Support Her Claim for Damages under Kolstad, and as such, Defendant's Motion for Summary Judgment on this Count Should Be Denied.</u>**

In its final argument, Defendant claims that Plaintiff failed to develop sufficient facts to support her demand for punitive damages. Plaintiff contends otherwise, and notes that Defendant is viewing Plaintiff's claim for punitive damages pursuant to the incorrect standard.

In <u>Kolstad v. The American Dental Association</u>, 527 U.S. 526, 119 S. Ct. 2118 (Decided June 22, 1999), the United States Supreme Court tackled a split of authority among the Circuit Courts and held that employers may be held vicariously liable for the discriminatory conduct of their management employees in certain circumstances.

**Importantly, the Kolstad court rejected the notion that an employee must prove "egregious misconduct" by its employer in order to qualify for punitive damages.[3]"**

Section 1981a(b)(1) of Title VII provides that:

> [An employee] may recover punitive damages under this section against [an employer]… if the [employee] demonstrates that the [employer] engaged in a discriminatory practice or discriminatory practices with **malice or reckless indifference to the federally protected rights of an aggrieved individual.**

In evaluating this section, the Supreme Court held that an aggrieved employee does not need to prove that the employer possessed the specific intent to discriminate against that particular employee, nor that the employer expressly or implicitly authorized the discriminatory misconduct.[4] As such, Defendant's reliance on Palmisano v. Toth, 624 A.2d 314, 318 (R.I. 1993), which held in a non-employment discrimination matter[5], that a plaintiff is entitled to obtain discovery of a Defendant's finances for purposes of punitive damages only when she produces "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amounts to criminality, which for the good of society and warning to the individual, ought to be punished ," is completely misplaced.

Instead of having to demonstrate that an employer's behavior or actions were "tantamount to criminality," the United States Supreme Court has placed a much lower

---

[3] The Kolstad court recognized, however, that examples of egregious misconduct certainly may be relied upon by an employee in efforts to meet his/her burden of proof when seeking to impose punitive damages against an employer.

[4] Instead, as it did in its Meritor, Ellerth and Faragher decisions, the Supreme Court examined common law agency principles when interpreting Title VII, and applied these principles, with certain limitations, to effectuate Title VII's preventive purpose (e.g., give employers every encouragement - and reward - for their efforts to combat Title VII discrimination).

[5] The Palmiscano v. Toth decision entailed a civil assault matter.

burden on a Plaintiff like Elliot. Pursuant to the Kolstad decision, an employer is vicariously responsible for discrimination where it acted with intentional or reckless indifference to the requirements imposed by Title VII. The terms "malice" and "reckless indifference" here refer to an employer's knowledge that it may be acting in violation of Title VII.[6]

Because the Kolstad standard examines an employer's general awareness that it may be violating Title VII, an employer who demonstrates that it engaged in a "good faith effort" to abide by and enforce the requirements of Title VII can render itself immune from punitive damages liability.

Plaintiff is able to produce evidence to support a finding that Defendant acted with intentional or reckless disregard for her statutorily protected rights. Throughout her deposition, Plaintiff references instances when she reported harassment to her supervisors, who not only did absolutely nothing to investigate or protect her in a harmful, difficult situation, despite a written policy mandating investigation and appropriate action, but also prevented her from using other avenues to achieve redress. Moreover, Plaintiff testified in her deposition that she was "instructed" by management not to call a hotline to report incidents of harassment. Specifically, Plaintiff testified as follows:

> Q. Okay. And during that time you didn't call the 800 number hot line, did you?
>
> A. No.
>
> Q. That hot line is in fact not only in the handbook that you referenced at least three times, but its posted on the bulletin board, isn't it?
>
> A. I believe it is. We were told not to call those phone numbers.

---

[6] As RI FEPA is patterned after Title VII, the Kolstad punitive damages standard applies to this matter.

Q. Who instructed you—

A. Management. Ken Osgood. To keep it in-house.

Q. You were specifically instructed not to call that telephone number?

A. Absolutely, absolutely.

Q. When were you instructed not to call?

A. He told me directly that it was not necessary for anyone to call those phone numbers. If you had a problem to come and see him.

(Plaintiff Tr. P193, L13-23). In a similar vein, plaintiff testified as follows:

Q. Did you ever--- was it Tom McDonald, you know, would it have been perception around the restaurant that corporate should not be called?

A. It was my understanding, and I recall Ken Osgood telling me if I had any problems that I was complaining about or I would go to him about they were to be handled in the Capital Grille Providence building.

(Plaintiff Tr. P194-195, L21-3).

Thus, it is clear from the actions, and inaction, of management, that it acted, and failed to act, with callous disregard for Plaintiff's statutorily protected rights. As such, Plaintiff's demand for punitive damages cannot be dismissed.

**F. <u>Plaintiff's RICRA Claim Should Not Be Dismissed As She is Able to Demonstrate Gender Based Discrimination in Violation of The Rhode Island Civil Rights Act</u>**

Defendant contends that Plaintiff's RICRA claims must fail as she is unable to establish that she was subjected to a hostile work environment or intentionally discriminated against due to her gender. Plaintiff is able to put forth sufficient facts in this respect, and as such, Defendant's Motion for Summary Judgment must be denied.

The Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws §§ 42-112-1 to -2, provides that all persons within the state, regardless of race, color, religion, sex,

disability, age, or country of ancestral origin, shall have the same rights to make and enforce contracts. The statute adopts a more expansive definition of contractual rights than does 42 U.S.C.S. § 1981 as it has been interpreted. The Rhode Island statute defines those rights to include the making, performance, modification and termination of contracts, and the enjoyment of all benefits, terms, and conditions of the contractual and other relationships.

In Liu v. Striuli, 36 F. Supp. 2d 452 (D.R.I. 1999), this Court declined to adopt the "overly narrow" reading of RICRA urged by Defendant. Judge Lageux wrote that the "language of RICRA . . . is decidedly broad and expansive." Moreover, precedent mandates that courts read the RICRA as broadly as possible -- which means that if individuals discriminate in ways that violate the statute, then they must be liable under it." Id.; see Ward, 639 A.2d at 1381-82.

In Liu, the Plaintiff was able to adduce enough evidence to survive Summary Judgment on her RICRA claim that she had been, *inter alia*, sexually harassed by one of her professors. The same should hold true in the case at bar: Plaintiff has developed enough facts in this matter to preclude the entry of summary judgment on her RICRA claim.

## G. Plaintiff's Failure to Allege Age Discrimination in her Charge of Discrimination Precludes Her from Litigating that Issue in this Forum

In Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, it correctly argues that Plaintiff is precluded from litigating any age-based discrimination allegations in this forum, as she failed to allege age-based discrimination in her Charge of Discrimination. Specifically, Plaintiff alleged "Sex" and "Retaliation,"

but not "Age" as the bases for her claims of discrimination. As such, Plaintiff concedes that her age-based claims are barred.

**V. CONCLUSION.**

For all of the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted,
Plaintiff Linda Elliot,
By Her Attorneys,

SAMMARTINO & BERG LLP

/s/ Catherine A. Sammartino_____
Catherine A. Sammartino, Esquire
Andrew Berg, Esquire
Marta E. Garrett, Esquire
Shakespeare Hall
128 Dorrance Street, Suite 400
Providence, Rhode Island 02903
(401) 274-0113
(401) 274-0175

**CERTIFICATION OF SERVICE**

I hereby certify that on this _30__ day of November, 2006, that I caused a true copy of the within to be filed, via electronic case filing, to the following counsel of record:

Sheryl Hanley, Esquire
Steve Macgillivray, Esquire
Ray Ripple, Esquire
EDWARDS ANGELL PALMER & DODGE
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611

/s/ Marta E. Garrett
Marta E. Garrett