UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LINDA ELLIOT<br>Plaintiff | : | |
| v. | : | C.A.NO.: 05-479ML |
| RARE HOSPITALITY, INC. d/b/a THE CAPITAL GRILLE<br>Defendant | : | |

**PLAINTIFF, LINDA ELLIOT'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to the Local Rules of the District of Rhode Island, the Plaintiff, Linda Elliot, submits the following response in opposition to the Motion for Summary Judgment of Defendants.

Plaintiff contends that there is no issue of material fact with respect to the following facts identified by Defendants: paragraphs 1, 3, 12, 14, 18, 19, 21, 22, 24, 25, 27, 29, 32-33, 35, 37, 38, 39, 45, 46, 47, 48, 49, 50, 51, 54, 55, 56, 57.

**DEFENDANT'S UNDISPUTED MATERIAL FACTS**

The Plaintiff disputes material facts alleged by Defendant as follows:

**A. Plaintiff's Job Position**

2. **Defendant's Statement:** Plaintiff was employed as a server at The Capital Grille's Providence, Rhode Island location for approximately twelve (12) years, from November 1991, until her termination on September 26, 2002.

**Plaintiff's Response:** Plaintiff was hired by The Capital Grille as a server in 1991. After approximately one year in that position, she was awarded a promotion to Head Server. A copy of Linda Elliot's deposition transcript ("Elliot Tr.") is attached as Exhibit A. (Elliot Tr. at 43: 14-15). Such a position is rarely held by a woman. (Elliot Tr. at 46: 22-25; 143-144: 20--4).

4. **Defendants' Statement**: As head server, Plaintiff handled additional job responsibilities, which included the handling of money for the cash-out of other servers, training new servers, and assisting management with the closing of business at the end of a shift. (Elliot Tr. at 44: 18-20). On account of her position as head server, she was familiar with management's responsibilities and policies. (Elliot Tr. at 45: 18-20).

**Plaintiff's Response:** Plaintiff objects to this statement to the extent it suggests that because Plaintiff acted as a head server, she somehow possesses the knowledge and training of a Capital Grille manager. Plaintiff's familiarity with management's policies was confined to the extent of her actions as a head server. Specifically, Plaintiff testified in her deposition that in the capacity of head server, she worked as a "liaison" between the servers and the management regarding any concerns that the servers had or problems that occurred. (Elliot Tr. at 45: 10-17).

5. **Defendants' Statement**: Plaintiff was not the only head server at The Capital Grille. While there was only one head server per shift, several servers at The Capital Grille had the Head Server title (Elliot Tr. at 46: 15-17; 47: 2-4). However, Plaintiff was one of the most senior Head Servers and, as a result, enjoyed seniority in terms of preferred shifts and customer seating areas.

**Plaintiff's Response:** Out of seven head servers that Plaintiff could recall at her deposition, only two were women. (Elliot Tr. at 46: 22-25).

6. **Defendants' Statement**: During the relevant time period, head servers did not receive additional compensation from The Capital Grille that was higher that the wages of other servers. However, head servers had access to additional and more favorable seating areas within the restaurant, which provided the possibility of receiving tip income that was higher than other servers. (Elliot Tr. at 56: 15-23).

**Plaintiff's Response:** Other benefits that flowed to Head Servers included preferred shifts and working certain days of the week, specifically weekends, that were busier than others. (Elliot Tr. at 56:20 – 57:4).

## B. RARE's Team Member Handbook and Harassment Policies

7. **Defendant's Statement:** Plaintiff received a copy of RARE's Team Member Handbook. (Elliot Tr. at 50:18 – 51:1).

**Plaintiff's Response:** Plaintiff acknowledges receipt of a RARE Team Member Handbook, which was published in February 1998. Upon information and belief, there were several revisions of the Handbook during Plaintiff's tenure at The Capital Grille.

8. **Defendant's Statement:** RARE's Team Member Handbook, which is provided to all employees, contains a sexual harassment policy statement stating that:

[s]exual harassment . . . will not be tolerated at RARE HOSPITALITY, Inc., ,This includes harassment by supervisors, team members, vendors, and Guests. Any team member who engages in any action or conduct constituting harassment will be subject to appropriate disciplinary action, up to and including termination.

**Plaintiff's Response:** Plaintiff is not aware of and therefore cannot agree that every employee was given a copy of The Team Member handbook and/or any modifications and updates at the inception of employment or at any other time. Plaintiff admits and acknowledges that she received a copy of the 1998 RARE HOSPITALITY Team Member Handbook. (Elliot Tr. at 50: 13-16). Plaintiff denies that Defendant followed its written sexual harassment policy requirements, and maintains that it failed to promptly and effectively investigate her multiple complaints of gender based harassment by fellow servers and failed to implement appropriate, timely, and effective discipline, or any discipline at all. *See Plaintiff's Additional Undisputed Material Facts, infra p. 11, ¶¶*69,70**.**

9. **Defendant's Statement:** The sexual harassment policy further provides the following information regarding the report of claims of harassment:

> All complaints of harassment should be reported to one of your managers, your Regional Manager, or Nancy Winship in Human Resources (800) 434-MAIL. The important thing is that you talk to someone who can help, since we cannot protect you from such behavior if we are unaware that it is occurring. Every complaint will be investigated and appropriate action will be taken in accordance with this policy.

**Plaintiff's Response:** Plaintiff reported incidents of harassment to the manager, per the policy of The Capital Grille (Elliot Tr. at 133:13-15). Plaintiff never called the Regional Manager to discuss her concerns, because "the manager of the restaurant [General Manager Kenneth Osgood] insisted that we discuss any complaints with the management within the building only." (Elliot Tr. at 134: 6-8). In other words, Elliot was forbidden by her General Manager, Kenneth Osgood, from raising her concerns at the corporate level, in contravention of the above-identified policy terms. (Elliot Tr. at 136-137: 24-5). Mr. Osgood subsequently has been promoted to the position of Regional Manager. Excerpts from the deposition of Kenneth Osgood ("Osgood Tr.") are attached as Exhibit B; Osgood Tr. At 4: 2-4.

10. **Defendant's Statement:** The Team Member Handbook also specified numerous examples of reasons for which immediate termination would be appropriate, without resorting to lesser forms of warnings or reprimands. (Id.) Among the reasons, RARE specified that the following conduct is grounds for termination:

> 26. Disorderly conduct; engaging in horseplay, fighting or provoking a fight, or use of physical force against a team member or Guest except in self-defense; acts of violence towards a team member or Guest using obscene, profane

or abusive language; causing a disturbance; engaging in lewd, obscene or otherwise inappropriate or disorderly conduct.

**Plaintiff's Response:** While Plaintiff does not dispute that this is the statement made in the employee handbook, she does contend that Defendant's references to her "pushing and shoving" other servers as part of the grounds for her termination is disingenuous; there is no definition of the term "use of physical force" or "acts of violence" towards a team member; in fact, testimony was given that Plaintiff and the other servers worked in very close proximity to one another, in a fast-paced service environment. It is not out of the scope of rationality that the servers may have come into physical contact with one another during their shifts. Surely, this does not give rise to the type of behavior contemplated in the RARE handbook and quoted by Defendant, which behavior encompasses assault and battery (e.g., "acts of violence"), and "disorderly conduct."

11. **Defendant's Statement:** Plaintiff admits that it was The Capital Grille's policy that employees who engaged in the use of physical force in the workplace would be subjected to immediate termination. (Elliot Tr. at 93: 8 –11).

**Plaintiff's Response:** In her deposition testimony, Plaintiff agrees that it was the policy of the Capital Grille that if someone used physical force they could be subject to termination. However, there still lies the question of whether Plaintiff actually used "physical force" against her co-workers. Plaintiff denies the use of physical force. (Elliot Tr. at 83: 20-24; 108: 6-9, 15-18; 189: 13; <u>Exhibit C</u>, Linda Elliot's Answers to Interrogatories No. 6). This is a question of fact that precludes summary judgment.

**<u>C. Plaintiff's Employment at RARE and Her Allegations of Harassment</u>**

13. **Defendants' Statement:** During Plaintiff's first (10) years of employment—or from 1991 until 2001, she enjoyed working at The Capital Grille and did so in a "harassment-free environment." (Elliot Tr. at 65: 22-25).

**Plaintiff's Response**: Plaintiff testified at her deposition that she enjoyed working at The Capital Grille except for when she was being harassed and discriminated against. (Elliot Tr. at 65: 17-19). Plaintiff further maintains that she did not experience harassment or discrimination until the Capital Grille hired server Robert Moren, in or around 1999, then failed to meaningfully respond to her repeated complaints of harassment by him and his friends. (Elliot Tr. at 107: 5-25; 108: 6-9; 112: 17-21; <u>Exhibit C</u>, No. 3; Moren Tr. at 14: 23). As a result of her complaints against her coworkers, Elliot was demoted. (Linda Elliot's Answers to Interrogatories No. 6).

15. **Defendants' Statement**: Beginning in November 2001, Plaintiff alleges that she encountered harassment from several other servers that "wanted [her] fired." (Elliot Tr. at 141: 15—19).

**Plaintiff's Response**: In 2001-2002, Plaintiff began to encounter harassment from fellow workers. However, the harassment was not limited to their desire to see her fired, it was borne out of gender-based discrimination. Specifically, Plaintiff testified as follows: "because the other servers wanted the position that I had, yes. I do believe it was definitely gender based . . . they wanted women out of The Capital Grille." (Elliot Tr. at 199: 6-12). Plaintiff also referenced gender-based derogatory comments repeatedly made towards her by these servers, Tom McDonald and Robert Moren, including "bitch," "queen," and "hag." (Elliot Tr. at 114: 21-24; 114: 24-25; 115: 1-7). Plaintiff timely notified the Capital Grille of these comments and requested that appropriate remedial action be taken. Id. No such action was taken. *See Plaintiff's Additional Undisputed Material Facts, infra at p. 12, ¶¶77,78.*

16. **Defendants' Statement:** On November 7, 2001, Plaintiff alleges that she was preparing salads for dinner guests when she was asked to assist a food runner with the delivery of several meals. (Elliot Tr. at 84: 11-16). When she returned to her salads, they were no longer where she had left them. Plaintiff alleges that another server informed her that Regina Curren, a fellow server, had taken her salads. (Id. at 84:16-17). Plaintiff then returned to make additional salads and opened the refrigerator to obtain more salad. (Id. at 84: 20-24). Plaintiff alleges that Regina Curren then reached into the same refrigerator to obtain more salad, when a plastic bag of salad fell and hit Plaintiff in the face. (Id at 85: 3—10). According to Plaintiff, the incident went no further. (Id at 85:10-13) Regina Curren, however, alleged in a complaint reported to management that Plaintiff had pushed her during the incident. (Elliot Tr. at 88: 15-24).

**Plaintiff's Response**: In the same testimony given by Plaintiff, Elliot testified that Curren "reached over me into the same cabinet that I was at." (Elliot Tr. at 88: 20-22). Given the close proximity of two bodies reaching into the same cabinet, it is highly likely that the two would encounter one another. Thus, it is a question of fact whether Plaintiff "pushed" Ms. Curran at this time, or whether the two bumped into one another. Moreover, Defendant maintains that it has misplaced or lost Ms. Curran's complete personnel file, which would contain information with regard to Ms. Curran's alleged complaint and any other conduct by Ms. Curran that may be relevant for purposes of this proceeding. Ms. Curren was involuntarily terminated by the Capital Grille. The Deposition Transcript of Capital Grille Manager Steven Lydon ("Lydon Tr.") is attached as Exhibit D; Lydon Tr. at 65: 10-21.

17. **Defendants' Statement:** On November 8, 2001, the day following the incident with Regina Curran, Plaintiff was reprimanded by Brian Foye, The Capital Grille's Regional Director of Operations, for pushing Regina Curran. (Elliot Tr. at 90: 9-91:13).

**Plaintiff's Response:** Plaintiff does not dispute that she was reprimanded for the alleged "pushing" of Ms. Curran, but denies she ever did so. She also maintains that she was never given a chance to explain her "position or what happened . . . I was just told to sign a last chance agreement or I'd be terminated, so I did sign it under duress. I did not agree with it." (Elliot Tr. at 93: 4-7).

20. **Defendants' Statement**: Plaintiff later wrote a memorandum to Brian Foye expressing her concern that Regina Curran had lied regarding the pushing allegations. (Elliot Tr. at 135: 23-136:4).

**Plaintiff's Response:** Plaintiff did in fact write a memorandum to Brian Foye, but her concerns were never addressed by Mr. Foye or any other management staff. She also reported the repeated harassment that she had been subjected to by Rob Moren to her manager, Ken Osgood. He advised her not to "go to anyone else with these concerns." (Elliot Tr. at 136-137: 24-5).

23. **Defendants' Statement:** Plaintiff's car was "keyed" in the restaurant parking lot, but admitted that it did not occur on account of her age. (Elliot Tr. at 198: 12-13).

**Plaintiff's Response:** Plaintiff's car was "keyed" shortly after the incident with Regina Curren and she felt that she was being "attacked and crucified." (Elliot Tr. at 198: 20-25). She testified that the "keying" incident was based on her gender. (Elliot Tr. at 199: 3-4).

28. **Defendants' Statement**: Plaintiff maintained that Mr. McDonald, Mr. Moren, and other servers would not assist other servers, or otherwise act as "team players." (Elliot Tr. at 69: 12—15). Plaintiff, however, "could not remember the names" of those who had refused to help her. (Id. at 72: 8—10).

**Plaintiff's Response:** While plaintiff may have been unable to recall the names of the many servers employed by The Capital Grille at the time in question, she does testify that "the management felt the same way as she did . . . including Ken Osgood and Ron Mezza." (Elliot Tr. at 72: 12-24). Elliot also prepared a memorandum regarding the importance of teamwork, which Mr. Osgood copied and posted in the Capital Grille. (Elliot Tr. at 74: 9-11) A copy of the Teamwork document prepared by Elliot is attached as Exhibit E.

30. **Defendants' Statement**: When she reported this issue to the manager on duty at the time, Stephen Lydon, Mr. Lydon indicated that he would report the incident to Kenneth Osgood, the Managing Partner of The Capital Grille. Excerpts from Plaintiff's Responses are attached as Exhibit C at 6.

**Plaintiff's Response**: Plaintiff showed the poured milk to the manager on duty, Steve Lyden. He told plaintiff that he would talk to Ken Osgood, and told *her* to clean up the milk. Exhibit C, Plaintiff's Answers to Interrogatories, Number 6. Upon information and belief, Mr. Osgood never investigated the "poured milk" incident, instead, he met with Plaintiff and informed her that Tom McDonald had claimed that she had "pushed and shoved" him the night before. Id. In essence, Plaintiff's complaint about inappropriate conduct by Tom McDonald was converted into a claim against her. Id. In addition, Capital Grille Management forced Plaintiff to clean up the milk Mr. McDonald deliberately poured into the area she just had cleaned, clearly enforcing the

concept that Plaintiff's complaints were unwelcome, would not be given credence, and would not be handled in a fair and impartial manner. Id.

31. **Defendants' Statement:** On May 24, 2002, Plaintiff met with Mr. Osgood to discuss her recent complaint regarding Tom McDonald. During that meeting, Mr. Osgood informs plaintiff that there had been several recent complaints about her by Mr. McDonald regarding her inappropriate use of physical force in the workplace. (Elliot Tr. at 83: 5—84:7; Osgood Tr. at 39:19 –40:8).

**Plaintiff's Response:** Plaintiff denies ever having "pushed and shoved" any Capital Grille employee, including Mr. McDonald. Plaintiff's meeting with management to discuss the "pushing and shoving" allegations, made in response to her complaints of harassment, is direct evidence of management's failure to support Plaintiff which resulted in her summary, unlawful discharge. During her meeting with Mr. Osgood, he told Plaintiff that he never wanted to "hear anything more about the pushing and shoving." (Elliot Tr. at 191: 1-6). Based on that statement, coupled with her demotion, Plaintiff knew that her rights in the workplace would not be supported by management. (Elliot Tr. at 190: 19-21).

34. **Defendant's Statement:** Following her demotion from head server, Plaintiff claims that Mr. Moren and Mr. McDonald increased their discussions regarding pushing and shoving—"I became more aware of them constantly around me saying pushing and shoving, don't push me, don't shove me." (Elliot Tr. at 112: 18-24).

**Plaintiff's Response:** On September 21, 2002, Plaintiff was returning dirty glasses to the service bar. Rob Moren was there and as Plaintiff approached, she called out "behind you, coming in on your left." His left arm came across plaintiff, preventing her from setting the glasses on the counter. Moren then said something to the effect of "you bitch, you should say excuse me." Plaintiff countered by saying, "I believe I already excused myself." Moren then stated, "lick my dick." Later that night, Rob Moren and Tom McDonald were overheard by Plaintiff again talking about "pushing and shoving." Exhibit C, Linda Elliot's Answers to Interrogatories, No. 6.

36. **Defendant's Statement:** Plaintiff testified that she is not clear whether other servers heard Mr. Moren, Ms. Curran and Mr. McDonald discussing pushing and shoving. (Elliot Tr. at 111: 18-20).

**Plaintiff's Response:** While other servers may not have heard Moren, Curran and McDonald discussing pushing and shoving, Plaintiff was aware that these remarks were made on numerous occasions. (Elliot Tr. at 111: 8-12; Exhibit C, Linda Elliot's Answers to Interrogatories at 7-8).

40. **Defendant's Statement**: Mr. Moren complained to the manager on duty, Stephen Lydon, regarding the altercation. Excerpts from the Deposition of Robert Moren ("Moren Tr.") is attached as Exhibit F; Moren Tr. at 64: 15—65:7.

**Plaintiff's Response:** Discipline at the Capital Grille was not applied proportionately, fairly or in accordance with the established policy. When Mr. Moren made this complaint, it was investigated with more diligence than any complaint ever filed by Plaintiff, and Plaintiff was reprimanded as a result, without the opportunity to counter Mr. Moren's assertions. In addition, Mr. Moran was advised by the Capital Grille to reduce his complaint against Plaintiff to writing. (Moren Tr. 66:1-12). Elliot was never advised to reduce her complaints to writing. The Affidavit of Linda Elliot ("Ellliot Aff.") is attached as <u>Exhibit G</u>; Elliot Aff. at ¶ 1.

41. **Defendant's Statement:** On September 26, 2002, Mr. Osgood terminated Plaintiff for her conflict with Mr. Moren, and her violation of the Last Chance Agreement.

**Plaintiff's Statement:** At the time Plaintiff was fired, she told Mr. Osgood that she – not Rob Moren - had been verbally harassed, and that Moren would not let her pass him to deposit dirty glasses at the bar, called her a "bitch" and told her to "lick my dick." (Elliot Tr. at 203: 10-19). Plaintiff previously had reported this conflict to Manager Steve Lydon. (Elliot Tr. at 14: 2-5). Prior to this incident, which led to Plaintiff's termination, Plaintiff made several other complaints about derogatory comments toward her by Mr. Moren. (Elliot Tr. at 114-115: 21-4). Plaintiff therefore denies that she was terminated because of her conflict with Mr. Moren and violation of a Last Chance Agreement, which was given to her without the benefit of prior warnings in accordance Capital Grille Policy and its treatment of other servers for disciplinary issues. *See, Plaintiff's Additional Undisputed Material Facts, at p. 11, ¶¶71.* This presents questions of fact that preclude the entry of summary judgment.

42. **Defendants' Statement:** Upon leaving Mr. Osgood's office following her termination, Plaintiff slammed the office door into one of the servers upon her exiting the building.

**Plaintiff's Response:** Upon leaving Mr. Osgood's office, she was understandably upset that she had just been terminated. She may have pushed harder on the door at that time, but Defendants' suggestion that she intentionally slammed into a server is disingenuous. The server happened to be standing behind the door that Elliot exited. (Elliot Tr. at 180: 20-23). Defendant's suggestion that Plaintiff somehow intuited, or psychically identified, the server's presence behind the door to the room in which she was being terminated and deliberately slammed the door into him defies credulity. What is more likely is that the server, having been made aware of Plaintiff's impending termination, was eavesdropping at the door.

43. **Defendant's Statement**: Plaintiff claims that when she would discuss employment issues with her managers Ken Osgood or Steve Lydon they made comments along the lines of "why don't you just retire?" (Elliot Tr. At 173: 16;174:3). Plaintiff could only recall Mr. Lydon making this comment on two occasions. (Elliot Tr. at 176: 12-15). Moreover, Plaintiff could only recall such a discussion with Mr. Osgood

occurring on one occasion during her final year of employment, and "possibly" on one other occasion. (Elliot Tr. at 176:24-177:4.)

**Plaintiff's Statement:** The comments are inappropriate and represent direct evidence of age-based discrimination. Coupled with the Capital Grille's failure to investigate and act on Plaintiff's gender-based discrimination complaints, and its disparate discipline of Plaintiff compared to other servers, these comments also demonstrate that Plaintiff was discriminated against as an employee of The Capital Grille.

44. **Defendant's Statement**: Approximately three (3) months following her termination, Plaintiff alleges that she received a "hate letter" in the mail. (Elliot Tr. at 222; 12-15).

**Plaintiff's Response**: Following her termination, Plaintiff received a "hate card" in the mail. After an expert handwriting analysis was conducted, it was determined that the card had been written by Rob Moren. This information was presented to the Department of Labor and the Capital Grille at an unemployment benefits hearing, at which time, Plaintiff's counsel requested that the Capital Grille reinstate plaintiff's employment, and reopen any investigation that it had conducted concerning the complaint made by Rob Moren that led to Plaintiff's termination. Upon information and belief, no further investigation ever occurred, nor did Capital Grille offer to reinstate Plaintiff's employment. *See, Plaintiff's Additional Undisputed Material Facts at p. 12, ¶¶75-76.*

52. **Defendant's Statement**: Plaintiff never filed a complaint regarding the alleged harassment with RARE's human resources department in Atlanta, Georgia. (Elliot Tr. at 133:21 – 138:8). Plaintiff also never took advantage of the company's 1-800 Number, or "Hot Line," provided in the Team Member Handbook in order to report any alleged harassment." Id.

**Response of Plaintiff**: Plaintiff reported incidents of harassment to her managers, per the policy of The Capital Grille (Elliot Tr. at 133:13-15). Plaintiff never called the Regional Manager to discuss her concerns, because "the manager of the restaurant [Kenneth Osgood] insisted that we discuss any complaints with the management within the building only. (Elliot Tr. at 134: 6-8).

53. **Defendant's Statement:** Ronald Corbett, a server at The Capital Grille, testified that Plaintiff was aggressive. (Deposition Transcript of Ronald Corbett at 14:23-15:12). Mr. Corbett further testified that on one occasion he heard Plaintiff refer to a hostess as a "dirty Jew." (Id. at 17: 6-16).

**Response of Plaintiff:** Ron Corbett testified that Plaintiff was aggressive when she was functioning in the capacity of closing manager, a position that entailed the exercise of authority over other servers. As far as any allegations of Plaintiff "pushing" her co-workers, Mr. Corbett testified that he never personally observed this behavior,

rather he only "heard" about it. Excerpts from the Deposition of Ron Corbett ("Corbett Tr.") are attached as Exhibit H; Corbett Tr. at 15: 14-19). Plaintiff maintains that the "pushing" allegations are false, motivated by discriminatory animus, and were created in order to secure her departure from the Capital Grille. *See Additional Undisputed Material Facts, at p. 12 ¶¶* 72. Plaintiff denies making a derogatory remark about a hostess.

## II. ADDITIONAL UNDISPUTED MATERIAL FACTS

The plaintiff alleges the following undisputed material facts:

58. **Plaintiff's Statement**: Plaintiff did not experience any problems at the Capital Grille for several years. Linda Elliot first began experiencing harassment based upon her gender following the sale of the Capital Grille to Rare Hospitality, Inc. in the late 1990's, the related infusion of new management at the company, and the hiring of a new server, Robert Moren. (Elliot Tr. at 147: 21-25)

59. **Plaintiff's Statement**: Plaintiff repeatedly reported the harassment she experienced to management, who failed to intervene in the situation. (Elliot Tr. at 133: 13-15).

60. **Plaintiff's Statement:** The harassment that Plaintiff endured included repeatedly being subjected to sexist, derogatory comments from male co-workers, predominantly Rob Moren, including the terms "queen" "hag" and "bitch." (Elliot Tr. at 114: 21-24).

61. **Plaintiff's Statement**: In addition, one male server, Tom McDonald, deliberately poured a carton of milk into a refrigerator that Plaintiff just had cleaned. When Plaintiff reported this conduct, she was advised to clean the milk mess herself. Although she was promised an investigation, no record of any investigation of her complaint exists. Instead, she was chastised for allegedly "pushing and shoving" Mr. McDonald. Exhibit C, Linda Elliot's Answers to Interrogatories, No. 6.

62. **Plaintiff's Statement**: When female servers Helen Roberto, Monique O'Gara, and Nicole would be sweeping the floor, male servers would make derogatory comments when they were bending over. (Elliot Tr. at 159 – 163) These women expressed their concerns about these comments to Plaintiff, who in turn instructed them to report the issue to management (Elliot Tr. at 159 – 163); no record of any complaints, or of any investigations in response thereto, exists.

63. **Plaintiff's Statement**: Plantiff is petite, approximately 5'2" – 5'3". Tom McDonald is approximately 6'3" - 6'4". (Lydon Tr. at 21: 18-24)

64. **Plaintiff's Statement:** Defendant maintains that Plaintiff "pushed and shoved" Tom McDonald. However, manager Steven Lydon, who at deposition initially

maintained that Plaintiff "struck" McDonald, upon further questioning described the encounter as Plaintiff's putting her elbow into McDonald's side. (Lydon Tr. at 20 – 22).

65. **Plaintiff's Statement**: The same male co-workers who subjected Plaintiff to sexist, derogatory remarks also harassed her by making false accusations of misconduct against Plaintiff, specifically, that she pushed and shoved her co-workers, and interfered with her serving of customers, and performing her job functions. (Elliot Tr. at 83: 20-24; 108: 6-9, 15-18; 189: 13; Exhibit C, Linda Elliot's Answers to Interrogatories No. 6).

66. **Plaintiff's Statement**: After complaining to management about these incidents, Plaintiff was demoted and ultimately terminated. (Linda Elliot's Answers to Interrogatories No. 6).

67. **Plaintiff's Statement:** When Plaintiff complained to manager Kenneth Osgood that her co-workers were harassing her and concocting allegations of pushing in order to secure her termination, he ultimately advised her that he did not want to hear any more about pushing and shoving. (Elliot Tr. at 191: 9-11).

68. **Plaintiff's Statement:** When Robert Moren complained about Plaintiff, manager Ken Osgood advised him to reduce his complaint to writing. (Moren Tr. at 66: 1-12). This written complaint was submitted to Capital Grille's corporate headquarters and resulted in Plaintiff's termination.

69. **Plaintiff's Statement:** When Ronald Corbett complained about Robert Moren, Manager Ronald Mesa advised him to reduce his complaint to writing. (Corbett Tr. at 26: 9-16; 27: 9-14). Ultimately, a "no contact" order was issued by management that Corbett and Moren should not be in contact with one another. (Corbett Tr. at 30-31, 19-2).

70. **Plaintiff's Statement:** When Plaintiff complained to her managers about harassment and discrimination, she never was advised to reduce her complaints to writing. Elliot Aff. at ¶1. No records exist that demonstrate that any of Plaintiff's complaints were submitted to Capital Grille's corporate headquarters, as was done with Robert Moren's complaint about Plaintiff, and Ronald Corbett's complaint about Robert Moren. Defendant's Reponses to Plaintiff's Requests for Production Nos. 16 and 17 are attached as Exhibit I.

71. **Plaintiff's Statement:** In fact, Plaintiff was advised by Manager Kenneth Osgood that she was forbidden from relaying her complaints to corporate headquarters. (Elliot Tr. at 136-137: 24-5). This directive contravenes the Capital Grille's written policy, which provides that an employee may direct his or her concerns either to local management *or* to corporate headquarters. Exhibit J, excerpt, RARE HOSPITALITY Employee Handbook.

72. **Plaintiff's Statement**: Robert Moren received the benefit of multiple warnings, all reduced to writing, before he was placed on a "last chance agreement" for making discriminatory remarks, based upon sexual orientation and age, toward server Ronald Corbett. Specifically, an employee grievance form was completed by Manager Ronald Mesa that documented that "Rob Moren has displayed and irrational hatred for team member (Ron Corbett) for at least 2 years . . . insulting and degrading sexual remarks, verbal and physical conduct, shows hostility towards team member and defames because of age, epithets, slurs, intimidating, threatening a hostile act." Exhibit I. As such, Mr. Moren was effectively given two "last chance" warnings, whereas Plaintiff was only given one. (Exhibit F, p. 5-6). Moreover, Rob Moren remains an employee of The Capital Grille (Moren Tr. at 19: 19-24).

73. **Plaintiff's Statement**: Plaintiff denies ever having pushed or shoved any employee of the Capital Grille. (Elliot Tr. at 83: 20-24; 108: 6-9, 15-18; 189: 13; Exhibit B, Linda Elliot's Answers to Interrogatories No. 6)

74. **Plaintiff's Statement**: Following Plaintiff's termination, approximately two and one half months later, she received an anonymous holiday card containing hateful and derogatory references to her gender and age, including "Fired at 60!! HA HA," "monkey woman," "You finally got what you deserved, you ugly, sex-less, no-class hag," and "no unemployment 'Denied'." (the "Hate Mail"). A copy of the Hate Mail is attached as Exhibit K.

75. **Plaintiff's Statement**: The Capital Grille challenged Plaintiff's entitlement to unemployment benefits based upon Robert Moren's complaint against Plaintiff. Plaintiff's application initially was denied in November 2003, appealed on November 22, 2003, and scheduled for appeal hearings in January 2004. Correspondence from the Department of Labor concerning Plaintiff's unemployment proceedings is attached as Exhibit L. Plaintiff received unemployment benefits after the Department of Labor reversed its initial denial on appeal. Exhibit L.

76. **Plaintiff's Statement**: At the appeal proceedings with regard to Plaintiff's entitlement to unemployment benefits, Plaintiff provided to the Department of Labor and the Capital Grille a report by handwriting expert Pauline Patchis that determined that Rob Moren had authored the Hate Mail. At that proceeding, Plaintiff's counsel requested to General Manager Kenneth Osgood that the Capital Grille reopen its investigation regarding the Rob Moren's complaint against Plaintiff and reinstate Plaintiff. (Elliot Tr. at 213: 9-15). A copy of Pauline Patchis's January 8, 2003, handwriting report is attached as Exhibit M.

77. **Plaintiff's Statement:** The terms contained in the Hate Mail, including "hag," "no-sex," and "fired at 60!! HA HA" mirror and/or closely resemble the phrases Plaintiff repeatedly complained to the Capital Grille that Rob Moren was using against her: hag, bitch, and queen. Exhibit K; Elliot Tr. at 114: 21-24.

78. **Plaintiff's Statement:** No action was taken by the Capital Grille in response to its receipt of the reinstatement request, based on an expert's opinion that Rob Moren authored the Hate Mail, despite the fact that the Hate Mail echoed Plaintiff's multiple complaints of harassment by Robert Moren.

79. **Plaintiff's Statement**: On the evening that Robert Moren initiated a complaint against Plaintiff, Plaintiff also made a complaint against Moren. Specifically, she notified manager Steve Lydon that Robert Moren had raised his arm to prevent her from placing cocktail glasses on the bar, then told Plaintiff, when she asked him to move, "lick my dick." However, her complaint, unlike Moren's, was never asked by Management to be reduced to writing. Elliot Aff. at ¶1. Unlike Moren's complaint, no documents exist to suggest that Plaintiff's complaint ever was investigated by the Capital Grille or forwarded to corporate headquarters. Exhibit I.

80. **Plaintiff's Statement:** In his 2004 complaint against Rob Moren, Capital Grille server Ronald Corbett stated that Moren told him he was "a sixty year old waiter. What a loser." (Grievance with Rob Moren, p. 2). At the time of this exchange, Mr. Corbett was not 60. The Hate Mail also references "Fired at 60!! HA HA" despite the fact that Plaintiff was in her early 50's at the time. Exhibit K.

.

81. **Plaintiff's Statement**: Plaintiff became so distraught upon her receipt of the Hate Mail that she immediately sought medical treatment from her physician, John Gaines, who referred her to the Butler Hospital due to concerns that she would commit suicide. Excerpts from the deposition of Dr. John Gaines ("Gaines Tr.") are attached as Exhibit N; Gaines Tr. at 17:14-17).

82. **Plaintiff's Statement**: According to the Deposition testimony of Dr. John Gaines, Plaintiff's treating physician, Plaintiff Linda Elliot "was going to kill herself . . . because she was distraught that she had been fired because she felt her work environment had been hostile." Also, "[S]he had been fired because she felt that her work environment had been hostile for a prolonged period of time, and to quote my note, she was fired in September when they alleged that this petite woman assaulted a great big man. And I go on to say she claimed that they were tying to get rid of her for a long time, since they hired a bunch of waiters who were fairly despicable. I don't recall which acts caused me to characterize it as such, but it certainly sounded despicable to me. But she tried to keep her head down and do her job, and ultimately she offered that she felt that this charge of assaulting a man was contrived… My recollection of her position was that because of her gender and because of her appearance, the sense I got is that she was given to believe that appearance and gender and age were not compatible with the image that her bosses wanted to portray at the restaurant." (Gaines Tr., pp. 8-9).

83. **Plaintiff's Statement:** Plaintiff was so distraught about being terminated that for an extended period she was unable to perform routine household responsibilities such as cooking, shopping, and ironing, engage in a meaningful way with her spouse, and otherwise function as she had before her termination. Excerpts from the deposition of Robert Elliot ("Elliot Tr.") are attached as Exhibit O; Elliot Tr. at 18-19: 11-5).

Moreover, on the day she was terminated, Plaintiff came home and told her husband that she had been fired because she was a woman. (Robert Elliot Tr. at 17: 7-17).

84. **Plaintiff's Statement:** For two years following Plaintiff's termination from The Capital Grille, she did not earn as much as she had while employed as a Head Server.

Respectfully Submitted,
Plaintiff,
Linda Elliot,
By Her Attorneys,

SAMMARTINO & BERG LLP

/s/ Catherine A. Sammartino
Catherine A. Sammartino, Esquire
Andrew Berg, Esquire
Marta Garrett, Esquire
Shakespeare Hall
128 Dorrance Street, Suite 400
Providence, Rhode Island 02903
(401) 274-0113
(401) 274-0175

**CERTIFICATION OF SERVICE**

I hereby certify that on this 30 day of November, 2006, that I caused a true copy of the within to be filed, via electronic case filing, to the following counsel of record:

Sheryl Hanley, Esquire
Steve Macgillivray, Esquire
Ray Ripple, Esquire
EDWARDS ANGELL PALMER & DODGE
2800 Financial Plaza
Providence, Rhode Island 02903
(401) 274-9200
(401) 276-6611

/s/ Marta E. Garrett
Marta E. Garrett