# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LINDA ELLIOT :
:
VS. : C.A. NO. 05-479-ML
:
RARE HOSPITALITY, INC. d/b/a :
THE CAPITAL GRILLE :

DEPOSITION OF LINDA ELLIOT, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant, before Carole J. Ogden, Registered Professional Reporter, a Notary Public in and for the State of Rhode Island, at the offices of Edwards Angell Palmer & Dodge, LLP, 2800 Financial Plaza, Providence, Rhode Island, on September 14, 2006 at 10:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF.... SAMMARTINO & BERG, LLP
128 DORRANCE STREET, SUITE 400
PROVIDENCE, RHODE ISLAND 02903
BY: CATHERINE SAMMARTINO, ESQUIRE

FOR THE DEFENDANT.... EDWARDS ANGELL PALMER & DODGE, LLP
2800 FINANCIAL PLAZA
PROVIDENCE, RHODE ISLAND 02903
BY: SHERYL D. HANLEY, ESQUIRE
RAYMOND M. RIPPLE, ESQUIRE

RARE HOSPITALITY, LITIGATION COUNSEL
BY: KRISTEN HATHCOAT, ESQUIRE

ALSO PRESENT......... KENNETH OSGOOD

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920

Scituate, Rhode Island.

Q. Okay. How long have you been at that address?

A. Approximately 20 years.

Q. Do you own your home there?

A. Yes, I do.

Q. And do you live there alone or with a spouse?

A. With my husband.

Q. And how long have you been married?

A. 28 years.

Q. What is your husband's name, please?

A. Robert Alan Elliot.

Q. Is Alan A-l-l-e-n?

A. A-l-a-n.

Q. Thank you. And is he employed?

A. No, he's not.

Q. He's not. How long has he not been employed for?

A. Since 2001.

Q. Okay. Is he retired or what was the reason for his unemployment?

A. He's retired and disabled.

Q. And what's the nature of his disability?

A. He has a disabling illness, Parkinson's disease.

Q. Was that diagnosed in 2001?

A. It's been recently diagnosed in 2000 -- I believe 5.

Club 44 in 1986, where were you during that three-year period of '83 to '86?

A. From -- probably -- from Red Coach Grille in '83 I went to Club 44. '83. Besides working at Alpine Ski Sports.

Q. So were you at Club 44 for six years or for three years?

A. Three.

Q. Okay. So you started there in 1983 and you left in 1989 you testified?

A. Right.

Q. That's six years.

A. Then I guess it was six years.

Q. Okay. All right. So you worked Club 44 for six years and then you were simultaneously working at Alpine Ski and Sport?

A. Uh-huh.

Q. Then you left Club 44 to go to Holiday Inn at the Crossings?

A. Right.

Q. You worked there for three years?

A. Right.

Q. Who was your manager at the Crossings?

A. I can't remember.

Q. Do you remember who any supervisors were?

A. I can't remember.

Q. And where did you go after you left Holiday Inn at the Crossing?

A. Capital Grille.

Q. When did you begin working at the Grille?

A. 1991.

Q. Do you remember when in 1991?

A. I believe it was in November.

Q. And how did you learn about the opportunity to work there?

A. Through the business. Co-workers.

Q. Were other people that you knew applying to go work at the Capital Grille?

A. No.

Q. When you began working at the Capital Grille, did you know any of your co-workers?

A. No.

Q. Now, Alpine Ski and Sports, what was your position there?

A. I was head cashier, and I was in charge of active wear.

Q. That's a retail operation, correct?

A. Yes.

Q. It's not involved in the food service industry?

A. No.

Q. So of the positions that you've held in the food service industry, how many of those were you paid on -- based on tipped income?

A. All of them.

Q. Okay. So you've been in the serving business for a long time, correct?

A. Decades.

Q. Okay. Thanks. Now, currently where are you employed?

A. I work with Coldwell Banker.

Q. And when did you begin working with them?

A. 2003.

Q. Do you know what month?

A. Yes. It was August, September -- it would be August.

Q. And what's your work address?

A. 458 Putnam Pike, Smithfield, Rhode Island.

Q. And is there an office telephone number for you?

A. Yes.

Q. What's that?

A. 401-949-2200.

Q. How are you paid in that position?

A. Strictly commissions.

Q. Has it always been strictly commission?

A. Yes.

Q. Was there a time during training when you were paid a

salary?
A. No.
Q. And what is the commission based on?
A. It's based on commissions earned.
Q. Is that based on a percentage of the sales that you do for volume?
A. No. It's strictly on commissions.
Q. I'm trying to figure out how the commission that you earn is determined. Is it based on the volume of sales of real estate that you sell and the real estate transactions you're involved in?
A. Yes.
Q. And is there a set percentage that you normally earn based on the commission?
A. Yes.
Q. And what's that percentage?
A. 75 percent.
Q. Is that 75 percent of what?
A. Of the total commission.
Q. So if a house sells for $100,000, what would the commission in total be on a house?
A. It depends.
Q. Okay. There's not a set commission per house?
A. No, there is not.
Q. Is there a standard commission?

A. Oh, the standard I would say between four and six percent.
Q. And of that four to six percent, you are entitled to 75 percent?
A. No.
Q. What is the 75 percent that you would receive?
A. 75 percent of the side.
Q. What do you mean by the side?
A. Well, there's usually two sides to a commission.
MS. SAMMARTINO: Can we go off the record for a minute?
(DISCUSSION OFF THE RECORD)
Q. And what's your position at Coldwell Banker?
A. I am a realtor.
Q. Does that require a licensing?
A. Yes, it does.
Q. What did you have to do to earn your realtor's license?
A. You are required to pass an exam, state exam.
Q. Anything else?
A. And required to take other certain courses.
Q. Are you required to do anything on an annual basis to keep the certification?
A. Yes.
Q. And what did that involve if you know?

A. That's right.
Q. And you -- did you work at Yankee Candle while you were at the Capital Grille?
A. No.
Q. Not for a holiday season?
A. Never.
Q. You've stated in your interrogatory answer that you worked there during 2001, and in 2001 you were employed at the Capital Grille, correct?
A. Uh-huh. So this was probably an error here.
Q. Is that something that you should revise?
A. Yes.
Q. Correct?
MS. SAMMARTINO: Objection, but noted.
Q. So you worked at Yankee Candle during the holiday seasons for 2002, 2003, and 2004; is that correct?
A. Best I can recall I believe it was, yes. Could be between two and three seasons, Christmas.
Q. You worked there while you worked at Coldwell Banker?
A. Yes.
Q. Were you working at Yankee Candle when you sought counseling in late December 2002?
A. Yes.
Q. For the Capital Grille, you began working there in 1991, correct?

A. I believe so.
Q. Okay. What position did you start?
A. Server.
Q. What caused you to go there to look for a job?
A. A better paying job.
Q. What was the pay at the Capital Grille?
A. $2.89 an hour plus tips.
Q. What did you base your belief that it was a better paying job?
A. Reputation.
Q. Had you known anyone who worked at the Capital Grille?
A. No.
Q. How long had the restaurant been open when you began working there?
A. I believe it was less than a year.
Q. And how did you learn about its reputation?
A. Through conversations with friends.
Q. Do you recall what friends?
A. Just co-workers.
Q. Co-workers where?
A. Holiday Inn.
Q. Do you recall who any of them were?
A. No.
Q. Okay. Do you recall if any of your co-workers from the Holiday Inn applied for positions at the Capital

A. Uh-huh. Best that I can remember.
Q. And tell me about your duties as a server at the Grille.
A. I waited tables, and my responsibilities also included handling cash for cashout.
Q. Was that a typical server responsibility?
A. No.
Q. Why did you have that responsibility?
A. I was given it. I was awarded it actually.
Q. When were you awarded that?
A. I believe it was approximately one year after I had started working there.
Q. Do you know why you were awarded that?
A. There was a position available for head server.
Q. Okay. And who awarded you that position?
A. John Jesser.
Q. Do you know how to spell his last name?
A. J-e-s-s-e-r.
Q. And a position was available. Was it advertised?
A. No.
Q. How did you learn it was available?
A. The former head server had left.
Q. Were you aware that the position was available because of that departure?
A. Yes.

Q. Okay. Did you ask about the position?
A. No.
Q. Okay. How did you learn that it would be available or how did it come to your attention that you would be considered for it?
A. I was approached by the management.
Q. Who in management approached you?
A. John Jesser.
Q. Did anyone else approach you about it?
A. No.
Q. What was said?
A. He asked me if I was interested in it.
Q. And you responded that you were interested?
A. Yes.
Q. Okay. And were there additional duties that were required as head server?
A. Yes.
Q. What were those?
A. Cashing out other servers. Helping the manager settle up the business at the end of the night. Training other servers.
Q. You would train the new servers who began?
A. Yes.
Q. Did you have any supervisory responsibility for servers?

MS. SAMMARTINO: Objection. You can answer.
Q. You can answer.
A. I don't understand the question.
Q. Did you have any supervisory responsibility for any of the servers who were there as far as imposing any discipline, communicating with management regarding issues that might arise with staff?
A. Yes.
Q. What type of responsibilities?
A. I reported -- I was the liaison between the servers and the management regarding any concerns that the servers had or any problems that occurred.
Q. What type of concerns or problems would you report?
A. If an employee had a problem, if they were upset about anything regarding the company, things like that.
Q. So did you become familiar with management policies during that time?
A. Yes.
Q. Did you become familiar with the management staff?
A. Yes.
Q. Who were the managers during the time you were head server?
A. I'd say there was John Jesser, there was Bill --

gosh. I can't remember his name.
MR. OSGOOD: Leonardo.
A. Leonardo, Ken Cusson, and Ken Osgood.
Q. The one before Ken Osgood was Ken?
A. Cusson.
Q. Do you know how to spell that?
A. C-u-s-s-o-n.
Q. And did the four individuals you named have overlapping managerial responsibilities or were they successive?
A. Successive, I guess.
Q. Did you work with each of those four individuals as a head server?
A. Yes.
Q. Were there other head servers during that time?
A. Yes.
Q. How many?
A. I can't remember. I guess -- my guess is probably about five.
Q. Do you recall who any of them were?
A. Yes.
Q. And could you tell me their names?
A. There was Anthony Santori, Ron Corbett, Anthony DiChiaro, Theresa Franco, Tim Corcoran, Michael Matusiek. There might have been others. I just can't

remember.
Q. Was there generally one head server per shift or was there more than one per shift?
A. One.
Q. Of the individuals that you named, do you know how old Anthony Santori is?
A. I don't.
Q. How about Ron Corbett approximately?
A. I'd just be guessing. 50s.
Q. He's over 40?
A. I would guess.
Q. How about Anthony DiChiaro?
A. I have no idea.
Q. Okay. Theresa Franco?
A. I have no idea.
Q. Tim Corcoran? And Michael Matusiek, do you have any idea?
A. I don't.
Q. For Tim Corcoran you had no idea?
A. No.
Q. Just important when I'm asking questions we give audible answers.
A. Uh-huh.
Q. Because the Court Reporter won't be able to see you shaking your head. And what are the skills that are

liaison, you said you became familiar with the company's policies, correct?
A. Yes.
Q. And they have a company handbook, correct?
A. Yes.
Q. And are you familiar with that?
A. Yes.
MS. HANLEY: Okay. If I could have that marked as an exhibit, please.
(DEFENDANT'S EXHIBIT B MARKED FOR IDENTIFICATION)
Q. I'm showing you what's been marked as Exhibit B. Could you identify what that is?
A. This is the team member handbook.
Q. Okay.
A. And dated February 1998.
Q. Okay.
(DEFENDANT'S EXHIBIT C MARKED FOR IDENTIFICATION)
Q. I'm going to show you what's been marked as Exhibit C. Could you identify that document?
A. It's a team member acknowledgment regarding the team member handbook dated January 15, 2000, the drugfree workplace policy dated 2000, and tip pooling policy dated January 15.
Q. Is that your signature on each of those signature lines?

A. Yes, it is.
Q. Could you tell me about the training you participated in at the Capital Grille? Did you receive any training on issues? For example, did they have right to know hazardous substance training?
A. Yes.
Q. Did you participate in -- did they have other trainings of that type?
A. I don't understand your question.
Q. Did you attend any training sessions while you were employed at the Capital Grille?
A. Yes.
Q. What types of training sessions did you attend?
A. Bar code for liquor training. That's about all I can remember.
Q. And the right to know substance training you attended as well?
A. Yes.
Q. Did you have any training on the sexual harassment policy that you recall?
A. No.
Q. Do you recall receiving a copy of the sexual harassment policy?
A. No, I don't.
Q. Okay.

A. That would be Ned Grace.

Q. Do you recall when the company was sold?

A. My guess is -- I'm guessing '97.

Q. Okay. Do you recall who bought the company?

A. Longhorn Steakhouses.

Q. It was the same company who owned Longhorn Steakhouse?

A. Yes.

Q. Have there been other owners since that time that you're aware of?

A. I can't remember if it went to Longhorn or if there was anybody in between there.

Q. Was Longhorn the owners when you ended your employment?

A. Yes.

Q. And when the new owners came in in 1997, approximately what was the compensation for head server?

A. $2.89.

Q. And that's plus tips?

A. Yes.

Q. Were there any other benefits to being a head server?

A. Yes.

Q. What were those?

A. Preferred shifts.

Q. How were shifts assigned?

A. By the manager.

Q. And how would a head server have a preferred shift?
A. Certain days of the week, busiest days would be the weekends. Also preferred sections of the restaurant that were more popular than others.
Q. And among the head servers that -- you testified that there were more than one at a time?
A. Uh-huh.
Q. How was the determination made for who would have preference for the nights of the week for the shifts or for the sections?
A. Well, there were certain sections that were assigned to head servers only.
Q. Were those called something specific? Would they have numbers or names?
A. Yes. They were Sections 10 and 11 and 7.
Q. Were you -- did you work at any particular section within those three?
A. Yes.
Q. Which one was the one you worked at?
A. 10 and 11.
Q. Did you always work at those sections?
A. Primarily, yes.
Q. Was it split equally between 10 and 11, or did you predominantly work at one?
A. Predominantly at 10.

A. Less frequent than every week.
Q. Do you think it happened every month or was it less frequent than every month?
A. I'd say less frequent than every month.
Q. Do you think it happened every quarter or less frequent than every quarter?
A. Every quarter I would say. I would guess.
Q. Okay. So would you think you had one customer each quarter who likely did not leave a tip?
A. Yes.
Q. Do you think it was more than one customer per quarter?
A. It's possible.
Q. It's possible that it did not happen that frequently as well?
A. No. I would say it's possible that it did happen.
Q. Does that make it also possible that it did not happen?
A. Yes.
Q. When a tip was not left, did you know the reason why a tip was not left or did you make assumptions as to why a tip was not left?
A. You never know.
Q. I mean, did you assume it was poor service or --
A. No. No.

Q. You say that fairly confidently?
A. Yes.
Q. Why is that?
A. Well, because I mean, there's a lot of factors involved. There's some people that just do not tip. It's just the way in the business. There are people that go out for dinner and do not tip. Not everybody does. It's not required.
Q. Okay. But you never felt that it was a reflection on the service that you provided?
A. No. Absolutely not.
Q. So you didn't take it personally?
A. Never.
Q. Tell me about, you know, the work environment at the Grille? Was it a place that you enjoyed working?
MS. SAMMARTINO: Objection.
A. I enjoyed working at the Capital Grille except for when I was harassed and discriminated against, yes. I enjoyed working at the Capital Grille.
Q. You began working there in 1991?
A. Yes.
Q. And how long would you say you enjoyed working there in what you would consider to be a harassment-free environment?
A. I would say until 2001.

A. When help was asked they just scattered.
Q. And who -- are there any particular employees that you could identify who would not provide team service?
A. The atmosphere was -- the atmosphere was definitely there of no team service going on. A lot of the new servers, the newer team members that had joined the company. Even the older servers.
Q. Can you identify any particular servers who you felt this was necessary to draft?
MS. SAMMARTINO: Objection.
A. God. There were so many. Rob Moren was one.
Q. And what about Mr. Moren made you feel he wasn't a team player?
A. Whenever anybody called out for any help, he would never -- he wouldn't be there for them.
Q. Anyone else?
A. Tim Corcoran.
Q. What about Mr. Corcoran made you believe that he wasn't a team player?
A. When help was asked, he was never there for another server.
Q. Did these employees refuse to provide help or were they just not available to provide help?
A. I would say that they refused.
Q. They would -- would they actually say no, I won't

and I had ten dishes to carry, there would be no servers in the area.

Q. So it's not a case where someone expressly refused to help you when you asked them expressly, will you help me, is it?

A. I believe I have asked for help and been refused, yes.

Q. Do you know who refused to help you?

A. I can't remember the names right now on those occasions, but it did happen.

Q. How often did it happen?

A. Quite often. And not only to me personally. I mean, there were other servers that needed help and there was just no team service.

Q. Who else -- is that your opinion that there was no team service?

A. No. The management felt the same way as I did.

Q. Who in management felt that way?

A. Ken Osgood.

Q. And anyone else in management felt that way?

A. The other managers I believe at the time were probably Ron Mezza.

Q. Did Mr. Osgood say anything to you to lead you to that he believed there was no team service?

A. Yes.

A. I'd say less than ten but more than three.

Q. Okay. Somewhere between three and ten times?

A. Yes.

Q. That's in a three-year period correct?

A. Uh-huh. That's what led me to put this together actually, to try and pull the team together, to help pull the team together.

Q. Did you distribute this to anyone?

A. I actually showed it to Mr. Osgood who was the manager at the time, and I believe he posted it in the service area.

Q. Did you see it posted?

A. Yes, I did.

Q. Okay.

A. He actually laminated it and posted it.

Q. Did you draft both sheets of this document?

A. Yes, I did.

Q. Did you draft them at the same approximate time?

A. That I can't remember. I can't remember.

Q. Do you remember if there was any particular incident that led you to draft these?

A. No particular incident other than to try and improve the team service.

Q. Did you -- was it within your responsibility to draft this kind of document?

Q. And you've alleged in Paragraph 20 that you were demoted --
A. Yes.
Q. -- from head server. When did that occur?
A. That occurred when I complained about Tom McDonald.
Q. When was that?
A. That would be in May of 2002 I believe. It was in May of 2002.
Q. And how were you notified that you were no longer a head server?
A. I met with Ken Osgood.
Q. Was anyone else present?
A. I don't recall. I think it was just the two of us.
Q. Do you recall where you met?
A. In Ken Osgood's office.
Q. And do you recall what was said?
A. I do.
Q. Could you tell me what was said?
A. Ken Osgood told me that he didn't want to hear any more complaints, that -- about pushing or shoving, and I explained to Ken Osgood that I never pushed or shoved anyone.
Q. Were you aware that there had been complaints about

you pushing and shoving?
A. Yes.
Q. And how had you been made aware of that?
A. There was a -- there was an incident with Regina, the one that I talked to you a little earlier about with the salads, and she complained that I pushed and shoved her also, which was untrue.
Q. And what did happen?
A. It was a false complaint. What happened was Brian Foye came down and --
Q. What happened with Regina? Why don't we -- you said that you did not push and shove her. What did happen in the incident with Regina Curran?
A. What happened was I was preparing some salads for a table, and I went to help another server, went off to help another server. When I returned to pick up my salads to serve to my table, they were gone. So I asked whoever was in the service area there, you know, did they -- did anyone take my salads or you know, where were they? And evidently it was Regina who had taken the salads.
Q. How did you learn that?
A. I believe it was another server that said that, told me that.
Q. Do you recall who?

A. No, I don't. It wasn't a big thing. I just continued on and made my own salads.

Q. Did you ever discuss it with Regina?

A. No. I just proceeded to -- proceeded to open the refrigerator and make my salads and didn't think anything of it, and as I was making my salads, Regina was behind me reaching in the same door that I was and grabbed the salad, and as she pulled it from the refrigerator she hit the side of my head with it, and again, I didn't make anything of it. I just continued on to make my salads. I went off into the dining room, and she was just upset that someone I guess had said that she took my salads.

Q. If you didn't confront her, why was she upset?

A. I guess -- I guess someone must have told her -- I mean, that the salad -- that she had taken -- that told me that she had taken the salads. It was no big deal to me.

Q. Did you discuss it with anyone else after you, you know, asked where your salads were and were told by someone that Regina Curran had taken them? Did you discuss that with anyone else?

A. No.

Q. And you say -- when you said that she hit you in the head, on the side of the head with the salad bowl, did

A. I guess it's the corporate number for -- I've never called it.
Q. Did you know it existed?
A. Yes, I did.
Q. Had you ever referred anyone to call the number?
A. No.
Q. So during the time when you were training individuals who are, you know, mentoring them, did you ever have need to reference the 800 number?
A. No. No. It wasn't -- that wasn't the quality of servers that were there at the, you know, when we hired people.
Q. Is the 800 number sometimes referred to as a hot line?
A. I guess, yes.
Q. Okay. And Regina claimed that you pushed and shoved her?
A. Yes.
Q. And do you have any knowledge as to why -- what incident she was referring to?
A. I believe it was probably the incident where she reached over me into the same cabinet that I was at and -- I mean, I was just doing what I always do. It was part of my job to make salads, to reach into the refrigerator to make salads.
Q. And when you were at the refrigerator and Regina was

mean, I couldn't see her from behind me.

Q. Uh-huh. And when in time did this happen; do you recall --

A. During service.

Q. -- what year this happened?

A. That happened in November.

Q. Is that November of 2001?

A. November 2001.

Q. And what resulted from that incident?

A. Well, Regina had made a false complaint to I guess whoever she contacted that I had pushed her, and the very next day Brian Foye came to the restaurant and called me to the office.

Q. Who was Brian Foye?

A. Brian Foye? Director of -- I don't even know his title. Director of operations probably. I don't know.

Q. Was he above Ken Osgood?

A. Yes. Regional supervisor maybe.

MS. HANLEY: Okay. If I could get this marked.

(DEFENDANT'S EXHIBIT G MARKED FOR IDENTIFICATION)

Q. I'm showing you what's been marked as Exhibit G. Do you recognize that document?

A. Yes, I do.

Q. What's that?
A. This is a confidential memorandum written warning and last chance agreement dated November 8, 2001.
Q. And did you receive a copy of this?
A. Yes, I did.
Q. And who gave you a copy?
A. Brian Foye.
Q. Did he give it to you on the November 8, 2001 that it's dated or thereabouts?
A. I can't remember if -- no. I never did get a copy of it. I never got a copy of it.
Q. Is this your signature that appears on it?
A. Yes, it is.
Q. So you had seen a copy of it?
A. Yes.
Q. Had you reviewed a copy of it?
A. Yes. I signed it, but I never got a copy of it.
Q. Okay. But you read it prior to signing it?
A. Yes, I did.
Q. And it references a section of the team member handbook which is Exhibit B; is that correct? Do you see a reference in that --
A. What pages?
Q. Do you see a reference in the confidential memorandum to the RARE employee handbook in this, the document to

A. Yes.

Q. Okay. And so that accurately sets it forth in the last chance agreement, correct?

A. Yes, it does, but I was never given a chance to explain my position or what happened. I was just told to sign it or I'd be terminated, so I did sign it under duress. I did not agree with it.

Q. But do you agree that this was the policy of the Capital Grille that if someone did use physical force they were subject to termination?

A. Yes.

Q. You were not terminated, were you?

A. No. I would have been if I hadn't signed it.

Q. But you weren't terminated for that conduct?

A. No.

Q. That was --

MS. SAMMARTINO: Objection.

A. No.

Q. And how long did you continue to work there after this?

A. Let's see. If this happened in May, four months until January -- I'm sorry. Until September 26.

Q. Okay. So probably ten and a half months more, because you went through November 2001 until September 26, 2002?

for a very long time, and he felt that I was -- totally been mistreated.

Q. Did he say that?

A. Yes, he did.

Q. What did he say?

A. He said he didn't think it was right. He didn't think it was fair. He knew what was going on. He was -- he was witness to a lot of the harassment that I had endured while I was at the Capital Grille.

Q. What didn't he think was fair? Did he give you examples of what he didn't think was fair?

A. He didn't think it was fair that certain servers, certain male servers were complaining about me, about -- and making false statements.

Q. And what did he say in that regard? Did he identify any particular servers?

A. Rob Moren.

Q. Did he identify Rob Moren by name?

A. Yes.

Q. And what did he say about Rob Moren?

A. Well, he said he was a disgruntled employee.

Q. And what false statement had -- up until May of 2002, what false statement had he heard Rob Moren make about you?

A. Let's see. Chris and I had so many conversations.

Could you repeat that again? I'm sorry. I was trying to follow you.
Q. I'm trying to -- you're saying these conversations are taking place in approximately May of 2002.
A. Uh-huh.
Q. And you haven't thus far mentioned Rob Moren as having made false statements about you. I'm trying to determine what false statements you --
A. Pushing and shoving.
Q. When --
A. Chris was well aware that Tom McDonald and also Rob Moren and Regina, who was a friend of the male servers, he had heard these three servers say that they were -- that they were out to get me, and by that I meant that they were out to get me fired through their little -- it was their group that would constantly say that I was pushing and shoving people, which was totally false.
Q. Do you have any sense of why they would say that?
A. No, I don't. It's -- because it never happened.
Q. Is there anything --
A. I believe that they -- if they thought that they could go to management and make me look bad or complain about me that they would get me fired.
Q. You'd worked with them for long time, hadn't you?

regarding Tom McDonald and Rob Moren and Regina discussing pushing and shoving.

Q. Was this based on a conversation that Chris Reynolds had with those individuals or was it based on something he had heard from others?

A. It was a conversation that he and I had. I don't know.

Q. So you don't know if he has firsthand knowledge of a conversation that they had?

A. No. Myself, I personally heard them talking about pushing and shoving also. Tom McDonald, Rob Moren, and Regina.

Q. My question is do you know if Chris Reynolds personally heard them talking about it or whether he was just generally aware, you know, that he had heard of it?

A. I would say that.

Q. So you don't know that he actually witnessed them and heard them talking?

A. No, I don't.

Q. Okay.

A. I don't.

Q. Okay. Do you have any sense of how not being head server for those two to three weeks affected your sales during that time?

A. Yes. I could tell by my paychecks, because it's recorded.
Q. You kept copies of those paychecks?
A. Oh, yes.
Q. So if I were to look at that two to three-week period, do you think it would show that there was a reduction in your pay during that time?
A. It's possible. Depending on the business, but it's possible.
Q. Is it possible that there was not a reduction during that period of time?
A. It's possible.
Q. After the demotion did your relationship with your co-workers change from your point of view?
A. It changed with certain male servers, yes.
Q. And who were those?
A. That would be Tom McDonald and Rob Moren.
Q. And how did it change?
A. The pushing and shoving became -- I became more aware of them constantly around me saying pushing and shoving, don't push me, don't shove me.
Q. Were they touching you?
A. No. They were discussing pushing and shoving between themselves.
Q. Was Regina Curran still working there at this time?

conversations.

Q. Who did you discuss it with?

A. Since Tom McDonald had brought it up. There was Ron Mezza. There was Steve Lydon. Steve Lydon mostly. And Steve Lydon said to me, you know, I don't know why -- I don't know why you're taking it. I don't know why you continue to take this. Why don't you just retire?

Q. He said that to you? When did he say that to you?

A. In the office when I was cashing out with him.

Q. And what were his exact words if you recall?

A. Just what I said. Why do you continue to take this? Why don't you just retire? Haven't you made enough money?

Q. What did he mean by why do you continue to take this? Take what?

A. Because -- the harassment.

Q. Is that what you perceived him to mean? Is that what you perceived him to mean by why do you continue to take this?

A. Yes, because I mean, we discussed, him and I, we had discussed other incidents where Rob Moren had been calling me bitch. He had been calling me queen, evil one, things like that on the floor. They were discussed with management. They were talked about.

I -- they were well aware.
Q. Did you bring that to their attention?
A. Yes, I did. With Steve Lydon, Ron Mezza, Chris Phillips. Ken Osgood was aware of it.
Q. And when in time did those statements occur that you allege that Mr. Moren made?
A. On a nightly basis, especially during cashouts.
Q. And during what period of time?
A. I'd say between May and September, May -- November 2001 to September 2002. September 26, 2002.
Q. So between November and -- 2001 and September 2002, how often did -- do you believe Mr. Moren called you names?
A. Whenever he worked on a nightly basis.
Q. How many nights did you work with him in a given week?
A. With the rotation probably three to four.
Q. Did anyone witness him say these things?
A. Yes.
Q. Who would that be?
A. Mike Matusiek.
Q. And what -- how are you aware that he -- are you aware that he actually heard these conversations?
A. Yes. He actually said to me, you're not going to take that from him, are you?
Q. And Mr. Moren was a server as well?

to hear any -- any complaints from me at all. At that point in time they did not want to hear any complaints at all.
Q. Did you take that to the next level and complain to someone in human resources for the company?
A. No, I didn't.
Q. And did you ever call the hot line for the company?
A. No, I didn't. I mean, in the manual it said to address the manager. This manual here that you have is dated 1998, and it says over here, I guess it was Number 26 perhaps, if I remember.
Q. It's on Page 23 I think where you're referring.
A. Uh-huh. Yes. It says, all complaints of harassment should be reported to one of your managers, which I did.
Q. Uh-huh.
A. And that was the policy of the restaurant with the management to report all complaints to the manager.
Q. Does that sentence continue, Ms. Elliot?
A. Yes, it does.
Q. What does it say?
A. It says, your regional manager or Nancy Winship in human resources.
Q. And does it give a telephone number?
A. Yes, it does.

Q. Okay. Is Nancy Winship someone that you have ever called?
A. No.
Q. Did you ever call your regional manager to discuss these concerns?
A. No. The manager of the restaurant insisted that we discuss any complaints with the management within the building only.
Q. Okay. If you keep reading in that paragraph in the bold underlined section, after the telephone number what does that next sentence say?
A. The important thing is that you talk to someone who can help.
Q. Uh-huh.
A. Uh-huh.
Q. Keep reading, please.
A. Since we cannot protect you from such behavior if we are unaware that it is occurring. The management was aware. I made the management aware repeatedly of the problems and concerns I had throughout my employment at Capital Grille.
Q. And you testified that you didn't feel satisfied with the response you received; is that correct?
A. It wasn't a matter of being satisfied.
MS. SAMMARTINO: Objection.

A. It was what I had to deal with to work there. In order to work there. That was the policy of the restaurant with the management in the Capital Grille.

Q. And does -- is that what this policy says? You agree this team handbook sets forth the policies of the Capital Grille, doesn't it?

A. Yes, it does. It says to --

Q. What does that policy say you should do if you have a complaint of harassment?

MS. SAMMARTINO: I'm going to object. It says talk to your manager or human resources. She's testified she talked to her manager repeatedly. It doesn't say, if that doesn't work go to human resources. I think we're beating a dead horse.

Q. Well, I disagree. I'm asking you, did you talk to your regional manager?

MS. SAMMARTINO: Would that be Brian Foye?

A. Brian Foye. I actually spoke to Brian Foye, yes.

Q. When did you speak Brian Foye?

A. I spoke to Brian Foye when he insisted that I sign this --

Q. After the last chance agreement, did you call Brian Foye to complain about treatment you felt you were receiving at the Capital Grille?

A. I actually wrote a memo at one point I believe to Brian Foye regarding the issue with Regina Curran, explaining to him exactly what happened, that there was no pushing and shoving.
Q. In the summer of 2002 when you claim that you were subjected to this treatment from Rob Moren, a co-worker, did you call Brian Foye or write to Brian Foye?
A. No. I reported it to my manager within the restaurant --
Q. Did you --
A. -- where I worked.
Q. Did you call Nancy Winship in human resources?
A. No, I did not. I didn't feel as though, I mean, the management insisted that we report all concerns, problems, complaints or anything directly to the manager within the restaurant. We were told to keep it in-house, not to go above.
Q. Do you have a written policy that says that?
A. No, but I have -- I spoke to Mr. Osgood about it, and he's -- we had conversations about that.
Q. Did he direct you not to go to anyone else with your concerns?
A. He directed me not to go to anyone else, yes.
Q. He said, do not go to anyone else with these concerns?

A. He said to keep this -- if you have any problems come and see me. That was as far as he wanted it to go.
Q. Is that your assumption that that is as far as he wanted it to go?
A. No. That is what he said to me.
Q. What did he expressly say to you?
A. That if you have any problems or concerns come directly to me. There's no need to go out of this building to anyone else.
Q. Did he say that exactly to you?
A. Yes, he did. Those are his exact words.
Q. When did he say that to you?
A. While we were in a conversation while we were -- probably if I can recall it was during a cashout. I mean, we were very close.
Q. When did that conversation take place?
A. During the cashout.
Q. Was it in connection with a complaint that you were making?
A. Yes. It was regarding the Regina incident.
Q. After the Regina Curran incident, did Mr. Osgood ever tell you not to bring your concerns to anyone else?
A. No. Not that I can recall.
Q. Again, if you could just look on Exhibit D. Does that

also provide a telephone number for you to call?
A. Yes, it does. But when I signed this on January 1, this is not included in the handbook, so wouldn't the handbook supersede this?
Q. You -- this actually -- it was probably signed after the handbook.
A. Right. On January 1, but this was printed in '97, and it's not included in the '98 handout.
Q. When did you sign this document?
A. I signed it in '01.
Q. Okay.
A. Right.
Q. And is '01 before or after 1998?
A. It's after 1998, but this is -- this was from a '97, and the handbook that we have now that I was going by when I had a complaint was directed to the manager as it said in the handbook.
Q. Either way, does each document contain a phone number for you to call that is not your direct manager?
A. Yes.
Q. Okay. And did you take the opportunity to call any of the numbers that were provided to you by the Capital Grille?
MS. SAMMARTINO: Objection. She's testified she didn't have a copy of this document --

concern or problem that I had.

Q. Okay. So you're also testifying that this relationship with Rob Moren had been fine and then all of a sudden it was just deteriorated and he's all of a sudden calling you names?

A. I don't think it was ever fine. Since the day -- well, since the day he started working there.

Q. You testified it was very professional?

A. It was always professional, as it was with every server that I ever worked with and anyone that I worked with in the restaurant. That was my -- that was my level of professional.

Q. People were very professional with you?

A. Other than the ones that were harassing me, yes.

Q. Why did you think this was happening? I mean, all of a sudden in like November 2001, May 2002, you say this is going downhill. What was your belief as to why this was happening?

A. They wanted me fired.

Q. After all that time they wanted you fired?

A. Yes.

MS. SAMMARTINO: Objection.

Q. Did you think that was a new development?

A. It was a development from 2001 to 2002.

Q. Now, do you have the complaint, the exhibit that's the

Capital Grille?
A. I was consulted.
Q. Were you familiar with the applicant pool?
A. At times, yes.
Q. Would you know how many women applied for positions at the Capital Grille?
A. I wasn't directly involved in the hiring process itself, but on a consulting -- if someone probably, you know, came in to fill out an application, you know, I would probably have access to that, you know, through the manager asking, do you know this person or what do you know about them, you know.
Q. I want to find out what the basis is for your statement that they were not represented as they were in the community, because I don't know if you're basing that on statistical evidence and if you have any. I don't know if you're basing that on your assumption. If you could provide me with the basis for that statement.
A. I worked with very few women at the Capital Grille as servers, and very -- very, very limited as head servers.
Q. Were you -- you were not the only female head server, correct?
A. At the time -- during what period?

Q. During the period of time you worked there. Were there other female head servers while you were employed there?

A. Only two.

Q. And who were they?

A. They were Theresa Franco and a girl from Barrington. I can see her face, but I can't recall her name. She was from Barrington. The only other female head servers as long as I worked there, and there were times that I was the only head server from probably '97 or '98 on.

Q. And you said there were four or five head servers at any given time?

A. About that, yes.

Q. Okay.

A. Four or five.

Q. Okay.

MS. SAMMARTINO: Just to clarify the record, if you don't mind, Sheryl, can I follow up?

MS. HANLEY: Uh-huh.

MS. SAMMARTINO: Linda, when you say that you were the only other head server from '97 to '98 on, do you mean you were the only other female head server?

THE WITNESS: Yes, the only other

servers.
Q. Was it that --
A. There was a lot of seniority involved in that. He didn't understand that.
Q. Was it explained to him?
A. I don't know.
Q. Did you ever try to explain it to him?
A. No.
Q. As a head server, did you say, this is how the system is set up and why I'm a head server?
A. Well, he never really talked to me about it other than to harass me. That's all -- that's the only relationship other than professional that I had in dealing with him at cashout time and throughout the night of service. That's the relationship that we had. I mean, I was professional toward him at all times, and that was the relationship that he gave to me. It was harassment.
Q. You've testified that prior to July of 2002 he was professional in his dealings with you?
A. Well, then I need to correct that, because he was never professional with me. He began harassing me from the day he started working there. He -- and I brought it up to management right from the beginning when he first started working there that he was --

Q. Other than what you've testified to for Helen Roberto, did you ever witness any of the other female servers experience harassment while you were employed at the Capital Grille?

A. Yes.

Q. What -- who did you --

A. Again, whenever the side work was for a girl to sweep the floor, there was always a comment made against the girl --

Q. Did men sweep the floor as well?

A. Yes, but the men would make comments to the women. Dig deeper, which meant they had to bend down to reach under a cabinet.

Q. Were these -- what was the context for these comments? Were they said jokingly?

A. I took it as a derogatory comment for a man to look at a woman bending over. I would say that that was harassment, yes.

Q. Why would you feel that was harassment?

A. Because none of the men ever asked another man to bend over and stoop to do the sweeping.

Q. You felt they were giving you a particular direction on how to do it?

A. Well, what was the point?

Q. I mean, I'm trying to think of what context these

comments were happening in. Was it a joke?
A. I wouldn't consider it a joke if it was me.
Q. Did any of the other women complain about that?
A. Yes.
Q. Who did they complain to?
A. Me. And I would direct them, talk to the manager.
Q. Who complained to you about it?
A. Helen Roberto. There was even Monique. Even Monique O'Gara, the guys would say the same thing to her.
Q. Did Monique come to you to complain?
A. If it -- if any server came to me to complain about anything, I would direct them to the management.
Q. Do you recall Monique coming to you to complain?
A. She had made complaints to me about other male servers, yes.
Q. Did she ever complain about female servers?
A. No.
Q. Did anyone ever complain about female servers?
A. No.
Q. Did anyone ever complain about you?
A. Yes.
Q. Did any female servers ever complain about you?
A. Not that I'm aware of.
Q. You're not aware of any female servers who complained

about you?
A. No.
Q. But Regina Curran, did she complain about you?
A. Okay. Yes. You're right. Yes, she did. Regina Curran did, yes.
Q. Are you aware of any of the other female servers complaining about you?
A. No.
Q. Are you aware of Nicole complaining about the treatment she received from any of the male servers?
A. Yes.
Q. And what was that?
A. The same thing about having to bend over in the service area to sweep the floor.
Q. How often was this occurring?
A. Whenever they had to sweep the floor.
Q. Every time they had to sweep the floor?
A. Whenever it was -- yes.
Q. How often was it a female's turn to sweep the floor?
A. Whenever it was assigned to sweep the station.
Q. What time of day?
A. At night. At the end of the business.
Q. Who would witness this being said?
A. Other servers that were in the area.
Q. What other servers would witness it?

A. The servers that were on duty for that evening.
Q. Who else could, you know, would you know has personal knowledge that these comments were made?
A. The person that said it. The person that received it.
Q. Who said it?
A. The side work captain for the night. Whoever the side work captain was for the night is the one that said it, because that's the person that was in charge of the side work.
Q. Who was the side work captain on -- who could be the side work captains?
A. Along with the side work captain it could be any other server that was in the area. It wasn't necessarily only the side work captain that would say things about the girl that was sweeping the floor.
Q. I'm asking which side work captains did you personally hear make these comments?
MS. SAMMARTINO: Objection.
A. Tim Corcoran.
Q. Who did you hear Tim Corcoran make that comment to?
A. Helen Roberto.
Q. How many times did you hear Tim Corcoran make that comment to Helen Roberto?
A. Many times.

Q. How many?
A. Several.
Q. How many is several?
A. More than three, fewer than 25.
Q. 25 times do you think that occurred?
A. Fewer than three -- more than three, fewer than 25.
Q. More than ten?
A. More than ten.
Q. So ten to 25 times?
A. Yes, because that particular station that Helen had, that was the side work that went along with it.
Q. What station was that?
A. That was predominantly that station.
Q. What station was that?
A. 13. I'm sorry. 15.
Q. How often do you think that Tim Corcoran and Helen Roberto worked together?
A. Helen -- it's hard to say. I mean, they were both full-time employees.
Q. How many nights a week do you think that they were on the same shift together?
A. I'd say between three and four.
Q. You've testified that Helen Roberto worked there approximately nine to 12 months; is that correct?

A. No.
Q. Why don't you think so?
A. Well, due to the fact that they had just fired Regina, I took it pretty seriously.
Q. Had you ever seen a server be fired before?
A. Yes.
Q. And had you ever seen a female server be fired before?
A. Yes.
Q. Had you ever seen a male server be fired before?
A. Yes.
Q. Is it possible he was joking when he said that?
MS. SAMMARTINO: Objection.
A. No.
Q. It's not possible?
A. No.
Q. Were there any other comments regarding your retirement? You recalled this one incident where Mr. Lydon said this. Are there any other times where you recall him making a comment regarding your retirement?
A. Yes. He -- we had a conversation during a cashout, and it went very much like this, that he said to me, haven't you had enough of this? I guess I was probably complaining to him about some incident that had happened either that night or on a different

occasion. It was a conversation that we had, and he said to me, well, haven't you had enough? Don't you just want to just retire?

Q. Did you ever talk about retirement?

A. No.

Q. Had you --

A. I loved working at the Capital Grille. I'd still be there today. I'd be there until I retired.

Q. Had you ever brought up the subject with him?

A. No.

Q. Did you ever discuss your husband's retirement with him?

A. No.

Q. Did you discuss that with anyone?

A. No.

Q. Did you ever discuss retiring in general with any of your co-workers?

A. No. I'm much too young.

Q. Did other people talk about retiring?

A. Not that I know of.

Q. So it wasn't a topic of conversation that you had?

A. No.

Q. Other than those two instances with Mr. Lydon, do you ever recall anyone else ever mentioning retirement to you?

A. I believe we were talking about how I felt I was being treated with other servers with Mr. Osgood, and again, I do recall him saying the same thing basically, you know.

Q. Do you recall did he use the word retirement or was he asking you why you were still working at the Capital Grille?

A. No. I believe retirement did come up in a conversation.

Q. Do you think he used that express word?

A. Yes.

Q. How many times do you think you had conversations with Mr. Osgood that he mentioned the word retirement in reference to you?

A. Probably a couple. One or two.

Q. Do you recall a second instance and when that would have occurred?

A. Other than a cashout, no.

Q. Do you have any --

A. That was the most opportunity that we had actually to talk was usually during cashouts while we were waiting for the other servers to finish up. That's when most of the conversations took place.

Q. You don't have a specific recollection of a time and date of a conversation you had with him regarding

retirement?
A. Other than I recall it was within the last year.
Q. Do you recall two conversations or just one?
A. I do remember one, and it was during a cashout.
Q. Did you have this conversation with anyone other than Mr. Lydon and Mr. Osgood?
A. Conversation regarding?
Q. Retirement?
A. No.
Q. Now, when you were terminated at the Grille, tell me how you were notified of your termination?
A. I was called into the office when I arrived for work. It was probably about 20 of five, 4:40.
Q. Who did you meet with?
A. I met with Ken Osgood and I believe Steve Lydon was there.
Q. Was anyone else present?
A. No.
Q. And did you take any notes during this meeting?
A. No, I did not. It was very brief.
Q. And what happened?
A. I was told that I was terminated.
Q. Who told you that?
A. Ken Osgood.
Q. What else did Ken Osgood say?

Q. When did you speak with Mr. Moren?
A. Well, I didn't speak directly with him, but I did see him at a proceeding for -- let's see. What do you call that? Restraint where I applied for a restraining order. That was the next time that I'd seen him.
Q. Did you see Mr. McDonald again?
A. No.
Q. Did you see Mr. Lydon again?
A. No.
Q. Did you see Mr. Osgood after September 26, 2002?
A. Yes.
Q. When did you see Mr. Osgood?
A. At the hearing for the unemployment.
Q. Okay. Did you see Mr. Corcoran after you were terminated?
A. No.
Q. Okay. Did you see him the day you were terminated?
A. Yes.
Q. And tell me what -- when you saw him?
A. Just passed him by as I left. He was outside the door when I was leaving the office, and we passed that way. That was it.
Q. When you were leaving the office did --
A. That was the last time I saw him.

never protected. I was never -- nothing was -- any complaint that I had was never investigated.

Q. How do you know it was never investigated?

A. Because I never heard anything more about it.

Q. Do you know that they were not investigated?

A. Well, I know that Rob Moren is still working there today if he still is, and I'm not, so obviously the Capital Grille and the management took the position that they had investigated what Rob Moren said and that he is still working there today and I'm not, so -- that's what I do know.

Q. What did Rob Moren say?

A. Well, Rob Moren falsely accused me of pushing him I guess along with two other servers, Regina Curran and Tom McDonald. No one ever protected me when I made a complaint to management.

Q. And did you --

A. Nothing was investigated then. When these servers complained about me, to management, they were listened to.

Q. Did you provide management with names of witnesses who would have witnessed treatment that you say you received?

A. Yes.

Q. And what names of witnesses did you provide to

management?

A. I'm sorry?

Q. If you made a complaint that you were being treated poorly or harassed, whatever term you used?

A. Right.

Q. Did you complain to management and provide them with names of witnesses?

A. No.

Q. Why not?

A. Because it was said directly to me and in areas where there was just the two of us.

Q. When you say Mike Matusiek overheard --

A. Yes.

Q. -- Rob Moren make a derogatory comment to you, did you notify management that Mike had overheard that comment?

A. No.

Q. Why not?

A. Because I just went about my job and felt that if I had complained again to management I would not be listened to, nothing would be done. That's why I did not go to management. I was in fear of losing my job if I had gone to management again. That was the position that the management had with me, that they didn't want to hear anything more from Linda Elliot.

Q. Did they say they didn't want to hear anything more from you or they didn't want to hear anything about you pushing and shoving?

A. They didn't want to hear anything, no complaint from me. That's exactly what was said to me. Did not want to hear any more complaints from me.

Q. Was it complaints from you or complaints about you?

A. From me.

Q. Who said they did not want to hear any more complaints from you?

A. Ken Osgood.

Q. Is it in fact that he said he didn't want to hear any more complaints about you? Is that accurate?

A. No. That is not accurate.

Q. And did you ever call the human resource and let them know that Mike Matusiek had witnessed something that was said that you considered to be derogatory?

A. No.

Q. Why not?

A. Because I was in fear of losing my job.

Q. You thought contacting HR would put you in jeopardy of losing your job?

A. No, because according to the manual I addressed the manager. That was the -- that was -- when I --

Q. In fact, the manual gives you recourses other than

Q. And other than what you have just testified to, are there any other reasons that you believe your termination was based on your age that we haven't discussed?

A. Could you repeat it? I'm sorry.

Q. Well, there are a list of things in Interrogatory Response Number 6 of examples that you have provided of incidents, and I want to determine which if any of those you believe were based upon your age. For example, you say that your car was keyed.

A. Yes.

Q. Do you believe that was based on your age?

A. No.

Q. Do you believe that was based on your gender?

A. It was based on -- it wasn't based on either one of those.

Q. Okay. Do you know who did it for certain? I mean, do you know who did it?

A. No.

Q. Okay. And you didn't witness it being keyed, did you?

A. No, I did not. It happened right after the Regina incident though.

Q. And you said that you were being attacked and crucified?

A. Right.

Q. And do you believe that was based on your age?
A. No.
Q. Do you believe it was based on your gender?
A. Yes.
Q. Why do you believe it was based on your gender?
A. Because -- because other servers wanted the position that I had, yes. I do believe it was definitely gender based.
Q. Was it based on your gender or on your position?
A. Well, both. They wanted -- the Capital Grille's position was they wanted women out of the Capital Grille.
Q. Why do you believe that was the Capital Grille's position?
A. Because Steve Lydon said that to me.
Q. So Steve Lydon made a comment on one occasion that someone had said that. You don't know for certain whether Brian Foye ever said that, do you?
A. It's possible.
Q. It's possible he said it or it's possible he didn't say it?
A. It's possible that he said it.
MS. SAMMARTINO: Objection.
Q. But you don't know that he said it, correct?
MS. SAMMARTINO: Obviously she

that he -- that we saw at the hearing. That was the first time I'd seen that.

Q. So how did that -- you said you were returning bar glasses that evening to -- empty cocktail glasses to the bar?

A. Right.

Q. And he put his arm out to stop you?

A. Uh-huh.

Q. Then what happened?

A. And then he started to say things. I remember him calling me a bitch, and he said, say excuse me, and I said, knock it off, and I set the tray down and I walked back toward the dining room, and he followed me through the dining room and continued to say things to the nature of -- one that I can remember, some that I can't, and some that you couldn't understand, but one that I do clearly remember him saying was to lick his dick, right behind me as I was walking back into the dining room.

Q. Did anyone witness that?

A. No. There was just the two of us and the patrons that were in the restaurant.

Q. And what was he saying that in response to?

A. No idea.

Q. Had you said anything in response to him when he said,

Capital Grille?
A. Never. No.
Q. How did you -- were you referred to Ms. Factor? How did you find her as an attorney?
A. No. I sought -- I found her actually in the phone book.
Q. Had you known anyone who'd used her services before?
A. No.
Q. Now, you requested -- you have alleged that you requested reinstatement from the company?
A. Yes, I did.
Q. When did you do that?
A. Soon after I left. I wrote a letter to Capital Grille. I made a second request. Actually, Cathy Sammartino made a request at the hearing that I be reinstated as well.
Q. Was that at the unemployment hearing?
A. At the unemployment hearing, yes.
Q. And who did you make the request to?
A. Ken Osgood.
Q. Were all of the requests addressed to Ken Osgood?
A. No. Mine was written to -- I believe the director of operations. I can't recall his name.
Q. Was it someone outside Rhode Island?
A. Yes. It was addressed to the Atlanta office, the

A. What really triggered that was when I received the card from Rob Moren with all the slurs in there about me being fired at 60, about me being a bastard, a bitch, a queen.

Q. So it's the card you assume --

A. Monkey woman.

Q. -- that you believe came from Rob Moren, and I mean, it's an unsigned card that you received that you believe came from Rob Moren, and that came at what time?

A. That came right around Christmas.

Q. That was three months after you had lost your job at the Capital Grille?

A. Yes. The harassment still continued after I had left the Capital Grille.

Q. You hadn't seen him in that three-month period, correct?

A. No.

Q. And you hadn't had any communication from him during that three months?

A. No. No. No.

Q. All right. Do you have a sense of approximately how much weight you gained during that period?

A. Oh, I'd probably say about 25 pounds.

Q. Okay. Was any of that do you believe due to less