# Exhibit H

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC. SUPERIOR COURT

* * * * * * * * * * * * * * * * *

LINDA ELLIOT *

*

VS. * C.A. NO. 05-049ML

*

RARE HOSPITALITY, INC., d/b/a *

THE CAPITAL GRILLE *

* * * * * * * * * * * * * * * * *

DEPOSITION of RONALD P. CORBETT, taken on behalf of the Plaintiff on Thursday, October 12, 2006, at the offices of Sammartino & Berg, 128 Dorrance Street, Suite 450, Providence, Rhode Island, commencing at 10:00 A.M. before Rebecca J. Forte, Notary Public.

COPY

APPEARANCES

SAMMARTINO & BERG

BY: CATHERINE A. SAMMARTINO, ESQ....FOR THE PLAINTIFF

EDWARDS, ANGELL, PALMER & DODGE

BY: RAYMOND M. RIPPLE, ESQUIRE......FOR THE DEFENDANT

IRONS & ASSOCIATES

CERTIFIED PROFESSIONAL STENOGRAPHERS

11 South Angell Street #359

Providence, Rhode Island 02906

(401) 861-0909

I mean, it was just from time to time, and I didn't work -- I've worked sometimes just three shifts and sometimes four, and I only worked at night, so I didn't hear all these comments, only when I was there would I, and the general tenor of comments was that she was a little unstable.

Q Was there any explanation for that? Was there any information provided to substantiate that opinion of her?

A Not that I know of.

Q In your personal opinion, is Linda Elliot crazy?

MR. RIPPLE: Objection.

A I'm not a psychiatrist.

Q But none of the servers are either, correct?

A Right.

Q Okay.

A I'd rather not make a judgment on that.

Q All right. I understand that. Before Linda Elliot left The Capital Grille, did you observe her in any negative interactions with Tom McDonald?

A I didn't observe -- I did see part of it.

Q Okay. Can you describe what you saw?

A You see, Linda Elliot was in Station 10 every night, she was a very preferred server, she got the best

stations, the best schedule, and she always got set early and late. So, sometimes there was -- she was a very preferred server by management, and she actually was a closing manager sometimes, and sometimes she, when she wasn't a closing manager, she would feel like she had management powers, which she really didn't, so she would, like, order people around, and when people didn't jump, she would get angry, very quickly angry, and her demeanor was very aggressive and truculent, because she felt like they should respond to her like a manager, and she wasn't.

Q So, what happened between her and Tom McDonald?

A I think she pushed him at the service bar. That's all I know. She pushed him out of the way to get drinks at the service bar. I really don't know the story.

Q Did you see this?

A I did not see it.

Q When you say she pushed him, how did you get that information?

A Just from knowing that, I guess Tom filed a grievance against her.

Q So, did you speak to Tom about it or did you hear

question.

MS. SAMMARTINO: It's okay.

Q Are you aware of any other incidents between Linda Elliot and any other servers at The Capital Grille?

A Not with a server.

Q Anybody at Capital Grille?

A She was particularly aggressive with the host stand.

Q Who's that?

A The people, the women that seat the tables.

Q Oh, I see.

A And there was one night she was having a problem with Arden not seating her properly, or not getting her enough tables soon enough, and she called her a dirty Jew.

Q A what?

A A dirty Jew.

Q Did you hear that?

A Oh, yes, I did.

Q And who was it that she said this to?

A Arden.

Q Is that a last name or a first name?

A Arden was a first name. She had a way of doing that, using derogatory terms when she didn't get her way. I happened to be in earshot that one time to

is Thursday, June 10th, it says you spoke with which managers about this situation, the incident?

A Well, the two managers that were on were Ron Mezza and Steve Lydon.

Q So, you spoke with both of them about the incident?

A Yes.

Q And did they give you assurances that they would address it?

A Ron Mezza handed me the handbook about harassment, and he said, read pages 45 and 46 and fill it out, which I did, Ron Mezza gave me good advice, and I filled out the form, and then I mailed it off to corporate.

Q So, there was an actual form that you could fill out?

A Yes.

Q Okay.

MR. RIPPLE: Cassie, if I can just clarify one thing for the record. I learned yesterday that in addition to this form that we're talking about here, Plaintiff's 1, there's also a form which was sent directly to Atlanta.

MS. SAMMARTINO: Okay.

MR. RIPPLE: Which is what it's

referring to here.

MS. SAMMARTINO: Okay.

MR. RIPPLE: I didn't know about that until yesterday. I contacted people to obtain that as well. Obviously, ask Mr. Corbett any questions about it, but I just didn't want there to be any confusion about you asking about this document and referring to something different.

Q So, you filled out a form, a preprinted form?

A Uh-hum.

Q And to whom did you give that form?

A I didn't give it to anybody. I mailed it. I mailed it to the senior director of employee relations in Atlanta.

Q And do you recall that person's name?

A No, I don't.

Q And to whom did you give your grievance, which is Plaintiff's Exhibit Number 1?

A Ken Osgood.

Q On what day did you give Ken Osgood your grievance?

A I think it's dated right there, June 19, 2004.

Q How did you come about preparing this grievance?

A Ken Osgood wanted to have more, a more detailed account of the incident, so I sat down and recalled

Q And at some point you met with Mr. Osgood, correct?
A Correct.
Q Okay. Was that the following Monday?
A I don't remember if it was the Monday or not. I don't remember the day. I'm not scheduled to work on Mondays or Tuesdays or Wednesdays I think at this time. So, it might have been, this was prepared June 11, I think there must have been a time when Ken Osgood said, I want you to write a detailed account, and so that's what I did.
Q Did you ever have a meeting with Mr. Osgood and Mr. Moren?
A Yes.
Q And when was that?
A You know, it was probably -- this is dated June 19th. I don't know what day of the week that was, but it was certainly after that date, June 19th.
Q Okay. And what was the purpose of the meeting that you had with Mr. Moren and Mr. Osgood?
A Mr. Osgood wanted this issue to die, he wanted it to be buried, and he wanted us to make friends, and we had to have a working relationship, and the ground rules were he was not to talk to me and I was not to

talk to him, and that we were supposed to shake hands and go back to work. That's what we did.
Q And at that point were you advised of the results of the investigation or the outcome in any way?
A No.
Q Did you receive any kind of discipline?
A No. Only in the fact that I -- no, I didn't receive discipline.
Q Did Mr. Osgood express the opinion that this was a disagreement between servers?
MR. RIPPLE: Objection.
THE WITNESS: I can answer?
MR. RIPPLE: You can answer the question.
A He felt it was more like our personalities didn't get along, or something like that, that maybe I was a lot more angry about it. I was the one that was wronged, so.
Q Did you feel that he was playing it down?
A Yes.
Q And personally was it your opinion that it was a discriminatory attack on you?
MR. RIPPLE: Objection. Answer the question.