# Exhibit N

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

LINDA ELLIOT,
Plaintiff,
vs. C.A. NO.: 05-479-ML
RARE HOSPITALITY, INC.
d/b/a THE CAPITAL GRILLE

Defendant.

DEPOSITION OF DR. JOHN A. GAINES, in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Jane F. Cormier, CSR, a Notary Public in and for the State of Rhode Island, at Coastal Medical Group, 1524 Atwood Avenue, Johnston, Rhode Island, on October 18th, 2006, convening at 11:45 a.m.

APPEARANCES:

FOR THE PLAINTIFF:
SAMMARTINO & BERG LLP
BY: MARTA GARRETT, ESQ.

FOR THE DEFENDANT:
EDWARDS ANGELL PALMER & DODGE LLP
BY: RAYMOND M. RIPPLE, ESQ.

A Yes.
Q Same day?
A Almost always.
Q Just to back up for a moment. How long have you been a physician?
A Over 20 years.
Q And where had you practiced prior to Coastal Medical Group?
A I did my internship and residency at Brown. I did my chief residency at Brown. I went into practice with Dr. Paul Botelho, and I ultimately ran that practice myself, and that practice morphed into Coastal Medical, whenever it was that Coastal Medical formed. So, on some level I've had the same job since leaving Brown, but the name has changed several times.
Q And are you an internist or a primary care physician?
A I am an internist.
Q How long has Ms. Elliot been a patient of yours?
THE WITNESS: May a check my notes?
MR. RIPPLE: Yes, you may.
A A cursory review of my notes indicate that the first time I met her was July 19th, 2002. I believe that was the first time.



Q I would just like to take you back to December 27th of 2002. Do you recall a patient visit that Linda Elliot made to you on that day?
A I do.
Q Why did she come in for a doctor's appointment that day?
A I don't recall whether it was scheduled or whether it was emergent. It being four years ago, I don't recall. Is that important?
Q No.
A I mean, we could probably figure it out by looking back into the computer files as to whether this was an emergency visit or otherwise.
Q Well, referring you back to Defendant's Exhibit 1, there are some additional notations on -- in addition to the narratives that are on the doctor's notes, there are also some other medical references, such as neck supple, abdomen soft, those sorts of things. That leads me to believe that you also performed a full medical exam on that day.
A What it leads me to conclude is that it was a limited physical examination that was addressing her vital signs, her lungs, her heart, her abdomen and her neck. I mean, it was a limited physical examination.



Q But do you recall her reason for coming in that day?
A Very clearly.
Q What do you recall?
A I can read my note. I think it correlates completely with my recollection of the entire event.
Q Okay. Well, let's refer back to your note then. Are those notes her words as you tried to recall them, or are those notes your impression or summary --
A I would say --
Q -- of what she described?
A -- my notes are a combination. So, I wrote to summarize --
Q Yes.
A -- at the opening that she was saying she was going to kill herself is as close a quote as I was able to muster at the time.
Q Did she tell you why --
A She did.
Q -- she was suicidal?
A Yes.
Q And what did she say?
A She said that she was distraught because she had been fired.
Q Did she say why she had been fired?



A She indicated -- I can paraphrase my note if you would like.
Q That's fine.
A That she had been fired because she felt that her work environment had been hostile, had been hostile for a prolonged period of time, and to quote my note, she was fired in September when they alleged that this petite woman assaulted a great big man. And I go on to say she claimed that they were trying to get rid of her for a long time since they hired a bunch of waiters who were fairly despicable. I don't recall which acts caused me to characterize it as such, but it certainly sounded despicable to me. But she tried to keep her head down and do her job, and ultimately she offered that she felt that this charge of assaulting a man was contrived.
Q Did she say why she thought it was contrived, if you recall?
A My recollection of her position was that because of her gender and because of her appearance, the sense I got is that she was given to believe that her appearance and gender and age were not compatible with the image that her bosses wanted to portray at the restaurant.
Now, I haven't any idea whether that was the

tremendously high risk, which is what precipitated the transfer that ultimately occurred.

Q So, the fact that she informed you that she did not believe her husband to be supportive, and/or that he is a philanderer, that was not part of the reason that she came to see you that day that she was suicidal?

A Oh, absolutely not.

Q So, instead, it was information provided to you in response to your assessment as to her support network.

A It was information supplied to me in response to an attempt to assess her risk. And it was clear to me that with that response, there wasn't anybody close to her who was a non-professional who could offer any support, and therefore it changed what I needed to do for her. If she had a supportive family, if she had a mother who could step in, a sibling, a spouse, a child, then transferring somebody to a psychiatric institution wouldn't necessarily be the right answer. But given the problem that she had no safety net underneath her outside of professionals, it was certainly a major part in precipitating her transfer, and also in evaluating just how much risk her life was in. I concluded she was a great risk.



And I should make this clear, I had never heard about her husband, she had never complained about her husband, and the only reason that she responded is because I specifically asked what kind of support systems existed.

Q I understand. And in addition to evaluating Ms. Elliot's support network, were there other types of inquiries or tests that you performed to determine, or divine, as you said, whether or not she truly was suicidal, or the level of concern that you would have had for the patient?

A Physicians have certain objective criteria to try to determine who is at risk. And the front pages of newspapers indicate that they don't always work. And to that end, support network is a big part of it. Having family members who are prepared to step in is a huge safety net. Having an intent to kill one's self that is clear in the mind of the individual is very concerning. Having an actual manner with which to dispatch one's own life is also concerning. So, these are the cri -- and also how coherent somebody is, and how despondent they might be. And that's a far more subjective kind of indication. And as you might note at the end of the note, I noted that she, after crying for hours in



the office, that she was ultimately coherent. And the reason -- and maybe I'm answering more than you care to know -- but part of this was whether I needed to drive her over to the hospital myself, have my ambulance come and get her. And I had to assess whether I thought it was reasonable for this person to get in a car to drive across town to psychiatric hospital.

And so, my ultimate conclusion, based on these factors, was that she was plenty miserable and at high risk, but -- and that's the other thing I should point out. When coherent people make a promise to a physician or a person they consider significant that they won't harm themselves for a period of time, that tends to correlate very highly with not doing so.

So, I was concerned enough to feel that this was the real thing. This was not, in my opinion, calling out for help or some kind of histrionic fit. She never made any mention of potentially all of us meeting up today, at any time, before, during or after this, I should point out. But I was comfortable enough to allow her to drive there herself.

And I should say that the reason I put the last



sentence in was I was anxious about it, but my sense was that the psychological trauma of calling the rescue, and literally having her carried out of here, outweighed the risk of driving across town at that time. But I was still very concerned about this woman.

Q But by the end of your two-hour or so interaction with Ms. Elliot, she was able to drive herself away from your office; is that correct?

A Yes.

Q And did you refer her to anybody else following that meeting?

A I did not, but I didn't feel that I had any role in so doing. I referred her to a psychiatric hospital which has a superb network of psychiatrists and follow-up people. And I am not a psychiatrist myself, I'm a diagnostician.

Q Yes?

A Feeling it's my job to make the diagnosis, and their job to take care of it. I felt that she was in very good hands, and I saw no reason to send her elsewhere.

Q And when you were referring to the superb psychiatric medical facility, are you referring to Butler Hospital?